MICHAEL W. VIVOLI (Bar No. 184366)
mvivoli@vivolilaw.com
VIVOLI SACCUZZO, LLP
3104 Fourth Avenue
San Diego, California 92103
(619) 744-9992 (Tel)
(619) 744-9994 (Fax)

Attorneys for Plaintiff,
JEROME'S FURNITURE WAREHOUSE

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEROME'S FURNITURE WAREHOUSE, a California Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>ASHLEY FURNITURE INDUSTRIES, INC., a Wisconsin Corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.: 20-cv-1765-GPC-BGS<br><br>**PLAINTIFF JEROME'S FURNITIRE WAREHOUSE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT**<br><br>Date:  January 22, 2021<br>Time:  1:30 p.m.<br><br>Judge:  Hon. Gonzalo P. Curiel<br>Courtroom:  2D<br><br>Magistrate:  Hon. Bernard G. Skomal |

1

# **TABLE OF CONTENTS**

2  I.    SUMMARY O F OPPOSITION ............................................................. 1

3  II.   SUMMARY OF THE ALLEGATIONS AND INFERENCES ............ 3

4        A.   Plaintiff's History of Honest Advertising .................................... 3

5        B.   Ashley's History of False and Misleading Advertising .............. 3

6        C.   The Competitive Injury Sustained by Plaintiff and its Standing  5

7  III.  LEGAL STANDARD APPLICABLE TO MOTION ........................... 7

8  IV.   LEGAL ARGUMENT ........................................................................ 10

9        A.   Plaintiff's Allegations, Taken as a Whole, Meet Rule 9(b) ........ 10

10       B.   Plaintiff Has Sufficiently Alleged a Lanham Act Claim ............ 11

11            1.)   Ashley's "Disclaimers" Present, at Best, a Factual

12                  Dispute for Trial, But Do Not Cure its False and

                    Misleading Advertisements ................................................. 15

13       C.   Plaintiff Has Sufficiently Alleged Each of its UCL Claims ....... 18

14            a.   Plaintiff Has Standing to Sue Under Both the UCL and

15                 FAL ..................................................................................... 18

16            b.   Defendant's "No Adequate Remedy" Argument Ignores

17                 the Law of Alternative Pleading ......................................... 20

18            c.   Plaintiff Has Undeniably Alleged *Unfair* Competition .... 21

19            d.   Plaintiff is Entitled to Restitution Given the Facts Pled ... 22

20            e.   Plaintiff Has Sufficiently Alleged a UCL Claim .............. 23

21 V.    CONCLUSION .................................................................................... 24

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

1
## TABLE OF AUTHORITIES

2
**Cases**

3
*23andMe, Inc. v. Ancesry.com DNA, LLC* (N.D. Cal. 2018)

4
    356 F.Supp.3d 889, 908 ........................................................ 7, 15, 21

5
*Ashcroft v. Iqbal* (2009)

6
    556 U.S. 662, 679 ....................................................................... 7, 8

*Avid Identification Sys., Inc. v. Schering-Plough Corp.* (9th Cir. 2002)

7
    33 Fed.Appx. 854, 856 .................................................................. 14

8
*Ayers v. United States* (6th Cir. 2002)

9
    277 F.3d 821, 829 ........................................................................ 21

10
*Bank of the West v. Superior Court* (1992)

11
    2 Cal.4th 1254, at 1262 ........................................................... 23, 24

12
*Bobbleheads.com, LLC v. Wright Brothers, Inc.* (S.D. Cal. 2017)

    259 F.Supp.3d 1087 ..................................................................... 10

13
*Brady v. Bayer Corp.* (2018)

14
    26 Cal.App.5th 1156, 1173, 237 Cal.Rptr.3d 683 ................................ 18

15
*Carter v. Mitchell* (6th Cir. 2012)

16
    693 F.3d 555, 566 ........................................................................ 21

17
*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.* (1999)

    20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 ..................... 18, 21

18
*Chapman v. Skype, Inc.* (2013)

19
    220 Cal.App.4th 217, 226 ............................................................. 19

20
*Church & Dwight Co., Inc. v. S.C. Johnson & Son Inc.* (D.N.J. 1994)

21
    873 F.Supp. 893, 912 ................................................................... 15

22
*Clorox Company v. Reckitt Benkiser Group, PLC* (N.D. Cal. 2019)

    398 F.Supp.3d 623, 636 ........................................................... 16, 17

23
*Committee on Children's Television, Inc. v. General Foods Corp.* (1983)

24
    35 Cal.3d 197, 209 ...................................................................... 24

25
*Cooper v. Pickett* (9th Cir. 1997)

26
    137 F.3d 616, 627 ......................................................................... 8

27
*In re Tobacco II Cases* (2009)

28
    46 Cal.4th 298, 312 ..................................................................... 19

*JHP Pharmaceuticals, LLC v. Hospira, Inc.* (C.D. Cal. 2014)
    52 F.Supp.3d 992, 1003 ................................................................. 17

*Kasky v. Nike, Inc.* (2002)
    27 Cal.4th 939, 949 ....................................................................... 19

*Kaplan v. Rose* (9th Cir. 1994)
    49 F.3d 1353, 1370 ......................................................................... 8

*Korea Supply Co. v. Lockheed Martin Corp.* (2003)
    29 Cal.4th 1134 ............................................................................ 22

*Kraus v. Trinity Management Services, Inc.* (2000)
    23 Cal.4th at 127 .......................................................................... 22

*Kwikset Corp. Superior Court* (2011)
    51 Cal.4th 310, 326-327 ......................................................... 19, 20

*Levitt v. Yelp! Inc.* (9th Cir. 2014)
    765 F.3d 1123, 1136 ..................................................................... 22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.* (2014)
    572 U.S. 118, 138 ......................................................................... 14

*Luxul Tech. Inc. v. Nectarlux, LLC* (N.D. Cal. 2015)
    78 F.Supp.3d 1156, 1170 .............................................................. 14

*Neighborhood Assistance Corp. of Am. v. First One Lending Corp.*
  (C.D. Cal. May 15, 2012)
    2012 WL 1698368 ......................................................................... 13

*Newcal Indus., Inc. v. Ikon Off. Sol.* (9th Cir. 2008)
    513 F.3d 1038, 152 ....................................................................... 12

*Semegen v. Weidner* (9th Cir. 1985)
    780 F.2d 727, 731 ........................................................................... 8

*Sonner v. Premier Nutrition Corp.* (9th Cir. 2020)
    971 F.3d 834 ................................................................................. 21

*Stark v. Diageo Chateau & Estate Wines Co.* (N.D. Cal. 2012)
    907 F.Supp.2d 1042, 1067 ................................................. 14, 15, 21

*Sybersound Records, Inc. v. UAV Corp.* (9th Cir. 2008)
    517 F.3d 1137 ............................................................................... 23

*TrafficSchool.com, Inc. v. Edriver Inc.* (9th Cir. 2011)
    653 F.3d 820, 826 ......................................................................... 14

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

*Veera v. Banana Republic, LLC* (2016)
  6 Cal.App.5th 907, 914-915 ...................................................................... 19, 20

*Williams v. Gerber Prod. Co.* (9th Cir. 2008)
  552 F.3d 934, 938 ................................................................................... 17

**Statutes**

California Business & Professions Code Section 17200 ................................. 18, 23

California Business & Professions Code Section 17500 ................................. 18

California Business & Professions Code Section 17508 ................................. 22

**Rules**

Fed. R. Civ. P. 9(b) ............................................................... 7, 8, 10, 11

Fed. R. Civ. P. 12(b)(6) ........................................................... 7, 9, 11

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

I.      **SUMMARY OF OPPOSITION**

In Ashley's analysis, much like Humpty Dumpty's, when Ashley uses a word in its advertisements, "it means just what I choose it to mean – neither more nor less."[1]  Plaintiffs, however, submit ordinary consumers will disagree.  To an ordinary consumer the word "plus" means in addition to.  In other words, when Ashley's ads say a consumer will receive "50% off *plus* 12 months no interest," an ordinary consumer reasonably understands this to mean *both* 50% off the normal retail price *and* 12 months of interest-free payments.  No other reasonable conclusion can be reached, and the mental gymnastics Ashley engages in to suggest otherwise only affirms the allegations of the Complaint.

The ordinary understanding of the term "plus" – "this *plus* that" means "this *and* that," not "this *or* that."  That universal and grammatically correct understanding is undoubtedly why Ashley prominently places the word "**plus**" front and center at the top of its advertisements in between promotional terms while burying its "disclaimers" in miniscule font on the second page of its ads, if at all.  And, even if an ordinary consumer actually bothers to turn to the very bottom of the second page of Ashley's ads to comb through the fine print deliberately placed in microscopic and cartoonishly small font, they *still* will learn only that the "50% off" promotion prominently placed in Ashley's ad "cannot be combined with any other promotion or discount." (See Doc. No. 15.3, at p. 2.)

But what does that mean?  Does it mean the 50% off cannot be combined with any promotion or discount *other than* the deal boldly stated on the first page of Ashley's advertisement (e.g., 50% off plus 12 months interest free payments), or does it mean the 50% off *plus* 12 months of interest free payments cannot be combined with any other promotion or discount that may happen to exist in Ashley's stores, or something else?  To find the answer to that question, the

---

[1]      Charles Lutwidge Dodgson's *Through the Looking Glass.*

1

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

1    consumer must drive to Ashley's store, walk through its vast warehouse-like
2    buildings, spend time selecting merchandise, and then wait for Ashley's to present
3    a bill.  Only when it comes time for payment does Ashley explain its ads.  By that
4    time, however, the bait has already been swallowed and the purpose of Ashley's
5    misleading ads has been accomplished – to get customers in Ashley's stores rather
6    than Plaintiff's.  That basic premise, pled with adequate certainty, underlies the
7    merits of Plaintiff's claims and neither claim can be defeated at the pleading stage.

8        Ashley's 12(b)6 arguments impermissibly seek to turn a factual dispute into
9    a pleading obstacle but the law is clear – provided the Plaintiff alleges enough facts
10   to put the defendant on notice of the conduct alleged to give rise to the plaintiff's
11   claims, Rule 9(b) is satisfied, even assuming it applies.  Here, Ashley clearly
12   understands the nature of the conduct alleged, which is why it was able to cobble
13   together its frail arguments as to why its buried "disclaimers" allegedly cure the
14   patently false and misleading nature of its ads and representations set forth in the
15   Complaint (which they do not do, as a matter of law).  In either case, Plaintiff is
16   undeniably a "direct competitor" of Ashley, so Plaintiff's damages from Ashley's
17   false advertising are ***presumed***.

18       As for whether Plaintiff has sufficiently alleged each of the elements of its
19   Lanham Act claim, any objective application of the elements of the claim to the
20   Complaint make clear that it has.  Indeed, the express, albeit succinct allegations of
21   Plaintiff's Complaint fit neatly within each of the required elements of any
22   Lanham Act claim, particularly given the Complaint makes clear not only that
23   consumer confusion is *likely*, but that it already exists, as evidenced within the
24   incorporated consumer complaint regarding the very ad in question.  As for
25   Ashley's "buried disclaimers," which it *argues* cure the false and misleading
26   nature of its ads, the argument presents nothing more than a factual dispute for a
27   jury to decide.  The argument does not defeat Plaintiff's claims at the pleading
28   stage.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

1    Ashley fares no better on its challenges to Plaintiff's UCL claims, including
2    its disingenuous argument that a direct competitor lacks standing to sue for having
3    its customers diverted away through the use of false and misleading advertising.
4    The UCL prevents conduct that is *either* "unlawful, unfair or fraudulent," and the
5    UCL expressly applies to protect competitors, as well as consumers.   Here,
6    Ashley's conduct meets all three of the foregoing definitions under controlling law
7    and its diversion of customers from a direct competitor is precisely the type of
8    competitive injury the UCL and FAL were designed to curtail.

9    As such, Ashley's motion to dismiss must be denied on each and all of the
10   grounds asserted.   And, even if the motion were granted, in whole or in part, the
11   Court would be obliged to afford Plaintiff leave to amend its claims.

12   **II.    SUMMARY OF THE ALLEGATIONS AND INFERENCES**
13   **A.    Plaintiff's History of Honest Advertising.**

14   As set forth in the Complaint, Plaintiff has proudly and faithfully served
15   retail customers looking for quality furniture and home furnishings at a fair price
16   since 1954, when Plaintiff opened its first store in downtown San Diego. (See Doc.
17   No. 1, at ¶ 7.)  For the decades that followed, Plaintiff has modeled its business
18   behind the basic premise that reliably offering customers a quality product and
19   outstanding customer service at the lowest prices possible is the best way to build
20   and foster customer loyalty and to generate repeat business. (Ibid.)

21   **B.    Ashley's History of False and Misleading Advertising.**

22   Ashley, by contrast, has employed a far different business practice, and "one
23   that has harmed not only the buying public against whom Defendants purposefully
24   direct their unlawful business practices, but also Plaintiff by deceiving misled
25   customers into patronizing Defendants' Ashley stores, instead of Plaintiff's stores."
26   (Id. at p 8.)  Defendants accomplish that goal *not* by offering better merchandise of
27   lower prices, but through "false and misleading advertising practices purposefully
28   designed to deceive customers into misperceiving that Ashley has a 'better deal.'"

1   (Ibid.)   By way of an example advertisement "cut and pasted" right into the
2   Complaint,[2] Ashley routinely "advertises to the public discounts of up to 50% 'off'
3   of unspecified prices '*plus*' 60 months of interest free-payments; often while also
4   misstating the floor price of their inventory on Defendant's website to lure the
5   customers in." (Ibid.)   The Complaint makes clear, through multiple copies of the
6   advertisement in question, that Ashley repeatedly uses the same misleading term.
7   (See Doc. No. 1, at ¶ 8 and Exhibit "A" thereto.)

8       As the Complaint also makes clear, Ashley's ads are always designed to
9   mislead customers into patronizing Ashley's stores, "where customers find it
10  difficult if not impossible to discover the true prices of the merchandise they have
11  selected for purchase until one of Defendants' sales representatives actually
12  calculates and presents a purchase price." (See Doc. No. 1, at ¶ 8.)  Of course, by
13  that time, the customer has already invested time to travel to Defendants store and
14  has spent the time selecting (and in many cases, deliberating over with their spouse
15  or significant other) items they are far less likely to simply walk away from this
16  invested time and begin anew their search. (Ibid.)

17      As for the sample ad cut and pasted into Paragraph 8 of the Complaint, the
18  Complaint makes clear Ashley uses that same advertisement, "in various different
19  forms and through various different media (including printed ads and online-based
20  advertisements)" and almost always prominently feature the word "**PLUS**" in
21  between "50% OFF" and "12 MONTHS" of interest free payments. (See Doc. No.
22  1, at ¶ 9.)  Indeed, the same basic misrepresentation is present in Exhibit "A" to the
23  Complaint too.  But what Ashley does not tell its customers − "at least, not until
24  they are already inside an Ashley store and usually only after they have already

25
26  _____

27  [2]    As Ashley notes, the actual ad example copied within Paragraph 8 of the
28  Complaint represents *12*, rather than 60, months of interest-free payments, but the result
    is the same; customers are routinely misled into believing they will get up to 50% off

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

selected merchandize that hey have been mislead into believing is a deal too good to pass up – is that the customer may have *either* 50% off a price that may or not match what was advertised on Defendants' website (and may or may not already be artificially inflated), *or* 60 months of interest-free payments, but not both." (Id.)

As set forth in the Complaint, Ashley's deceptive and repetitive use of the word "*plus*" to plainly suggest its ordinary meaning of "and also this" "is a false and misleading tactic that Defendants continue to employ, despite the fact it has been the course of frequent complaint by customers." (Ibid.)  And, Exhibit "A" to the Complaint – also taken from the San Diego Union Tribune's Friday, September 4, 2020, edition – just five days before the Complaint was filed – includes yet another example of Ashley's misleading use of the term "**Plus**" in between "40% OFF" and "5 YEARS" of "NO interest," "NO down payment" and "NO minimum purchase." (See Doc. No. 1, at Ex. "A.")

While true that Ashley's purported "disclaimers" play a prominent role in its 12b6 motion, the Court will note they are anything *but* prominent in the sample ad attached as Exhibit "A" to the Complaint, or in the ad proffered by Ashley's with its motion.

### C.    The Competitive Injury Sustained by Plaintiff and its Standing.

The false and misleading advertisements regularly employed by Ashley's – through advertisements Ashley can undoubtedly itself locate and account for using its own business records, since it pays to place these ads – "is not only *likely* to confuse consumers, it regularly *causes* and will continue to cause actual confusion among consumers unless and until Defendants are enjoined from continuing to engage in such conduct." (See Doc. No. 1, at ¶ 10.)  To that end, a Better Business Bureau complaint submitted against Ashley and incorporated into the Complaint makes clear customers have been actually confused. (Ibid.)

---

Ashley's normal retail prices *plus* interest-free payments for some period of time when,

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

1       Ashley's conduct not only injures members of the general public, it also robs

2   Plaintiff of customer "foot traffic," the very lifeblood of the retail industry. (Id. at ¶

3   11.) Ashley's misconduct is not limited to the ads it has been running in the Union

4   Tribune for a period of time known by Ashley – Ashley has also used other false

5   and misleading statements to lure customers into its stores, only to have the

6   customers discover after selecting a product that the terms of purchase are far

7   different than were represented. (See Complaint, at ¶¶ 11-12.)

8       As for the "NO DOWN PAYMENT REQUIRED" representation within

9   Paragraph 12 of the Complaint, the allegation appears in Exhibit "A" to the

10   Complaint, where Ashley's proffered "disclaimer," in which it purportedly

11   explains that sales tax and delivery charges must be paid at the time of purchase,[3]

12   is virtually imperceptible to the human eye. "The cumulative result of Defendants'

13   false and misleading advertising, as set forth above and in the attached examples as

14   examples only, is that Defendants manage to generate an undeserved volume of

15   'foot traffic' through their doors." (Id. at ¶ 12.)

16       Along with the foot traffic lost to Ashley as a result of its false and

17   misleading ads, Plaintiff has also lost sales and resulting profits because "it is well

18   known within the furniture industry (and virtually all retail industries) that once

19   customers have entered a store (even where they have been misled into doing so),

20   they are typically reluctant to leave one store and try to begin anew to find a better

21   deal at another store." (See Doc. No. 1, at ¶ 13.) Ashley knowingly exploits

22   customer inertia through its misleading advertising for the sole purpose of "getting

23   customers in the door," where they then exploit their unfairly earned advantage, to

24   Plaintiff's detriment. (Id.)

25

26

27   in fact, they never get both.

28   [3]     Ashley claims, without dispositive evidentiary support, that a "down payment"
never includes sales tax and delivery charges, but provides no actual authority, much less

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

1    The Complaint further alleges that Ashley has diverted sales away from
2   Plaintiff by deceiving its customers into misperceiving that Ashley offers a better
3   deal when it does not, thus depriving Plaintiff of customers that would otherwise
4   patronize Plaintiff's stores.  These are the very customers Plaintiff has historically
5   managed to sell furniture and home furnishings to because a large percentage of
6   the customers who pass through its doors will purchase from Plaintiff. (Id. at ¶ 16.)
7   As a result, Plaintiff filed this action for both injunctive relief (to prevent Ashley
8   from continuing to fraudulently divert customers away from honest retailers like
9   Plaintiff) and the money damages suffered by Plaintiff as a result of Ashley's
10   diversion of Plaintiff's customers base and resulting sales and profits. (Ibid.)  It
11   seeks these remedies through two claims for relief – for false advertising in
12   violation of the Lanham Act and for Unfair Competition under the UCL and FAL
13   provisions of California's Business and Professions Code; both of which rely upon
14   the foregoing facts and incorporated allegations. (See Doc. No. 1, at ¶¶ 30-38.)

15   **III.   <u>LEGAL STANDARD APLICABLE TO MOTION</u>**

16    A Rule 12(b)(6) motion attacks the complaint as containing insufficient
17   factual allegations to state a claim for relief.  To survive a motion to dismiss under
18   Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as
19   true, to state a claim to relief that is plausible on its face." *(Ashcroft v. Iqbal*, 556
20   U.S. 662, 679 (2009) [citations omitted].)   Even where Rule 9 applies to a
21   complaint,[4] the plaintiff's allegations of fraud must merely be "specific enough to
22

23   dispositive authority, on this point.  Consumers clear understand the term to mean no
24   cash is required at the time of purchase.
     [4]    Although the Ninth Circuit has not definitively spoken as to whether Rule 9(b)
25   applies to Lanham Act claims, Plaintiff acknowledges that "the better reasoned [district
26   court] authority is that, where a Lanham Act claim is predicated on the theory that the
     defendant engaged in a knowing and intentional misrepresentation, then Rule 9(b) is
27   applicable." (*23andMe, Inc. v. Ancestry.com DNA, LLC*, 356 F.Supp.3d 889, 908 (N.D.
28   Cal. 2018).   Accordingly, Plaintiff will respond to Defendant's motion assuming
     application of the Rule 9(b) standard.

7

1   give defendants notice of the particular misconduct which is alleged to constitute
2   the fraud charged so that they can defend against the charge and not just deny that
3   they have done anything wrong." (*Semegen v. Weidner*, 780 F.2d 727, 731 (9th
4   Cir. 1985); see also *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) [noting
5   that particularity requires plaintiff to allege the "who, what, when, where, and
6   how" of the alleged fraudulent conduct].) While "detailed factual allegations" are
7   unnecessary, the complaint must allege more than "[t]hreadbare recitals of the
8   elements of a cause of action, supported by mere conclusory statements." (*Iqbal*,
9   *supra*, 556 U.S. at 678.)

10      Rule 9 does not require a plaintiff to detail each and every single fraudulent
11   representation or the precise method by which a defendant injured a plaintiff, even
12   where the claim is subject to Rule 9. Instead, Rule 9 requires only that the
13   complaint sufficiently identify "the circumstances of the alleged fraud so that
14   defendants can prepare an adequate answer." (*Cooper*, *supra*, 137 F.3d at 627
15   [quoting *Kaplan v. Rose*, 49 F.3d 1353, 1370 (9th Cir. 1994).) The Ninth Circuit
16   has declined to require a complaint to allege each and every detail of each and
17   every claim subject to Rule 9 because "we cannot make Rule 9(b) carry more
18   weight than it was meant to bear." (*Cooper*, *supra*, 137 F.3d, *supra*, 137 F.3d at
19   627 [citation omitted].)

20      As set forth below, Plaintiff has directly copied Ashley's false and
21   misleading advertisements into its Complaint. These are the same advertisements
22   Ashley pays to place all over Southern California and likely the United States.
23   Plaintiff has alleged Ashley's substantively identical republication in other
24   advertisements, and has alleged precisely why they are misleading; a fact that is
25   evident from the face of these advertisements when one learns that Ashley does not
26   honor the deal represented in its ads. Moreover, the Complaint does not merely
27   allege why Ashley's advertisements are "likely" to confuse customers; it is actually
28   the rare complaint that presents ***evidence*** that the ad has ***actually*** confused

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

1  consumers through an incorporated Better Business Bureau complaint about which
2  Ashley was undoubtedly already aware. (See Doc. No. 1, at ¶ 10.)

3      In addition, the Complaint specifically alleges other false and misleading
4  advertising by Ashley, including its pattern and practice of misleading the retail
5  value of its products in connection with advertising its prices.  To that end, the
6  Complaint makes clear, "Defendants will represent that 'this $2,000 sofa is now on
7  sale for $1,200," which tends to mislead consumers into believing Defendant's
8  "merchandise is of a higher quality than it truly is." (See Doc. No. 1, at ¶ 11.)  The
9  Complaint also makes clear that Ashley routinely represent, in a purposefully
10 conspicuous way, specials representing "NO DOWN PAYMENT REQUIRED,"
11 while burying in fine print that is deliberately placed in a fashion to evade the
12 ordinary consumer's discovery, the disclaimer that sales tax and delivery charges
13 must be paid at the time of purchase; "effectively resulting in a 'down payment' of
14 approximately 13%." (Id. at ¶ 12.)

15     Since the Complaint adequately apprises Ashley of the particular fraudulent
16 misconduct which is alleged so it can defend against the charge and not just deny
17 that Ashley has done anything wrong (which Ashley has already attempted to
18 begin doing, in its 12(b)6 motion), Ashley's motion to dismiss must be denied.
19 And even if the motion is granted, it should be granted without prejudice
20 (consistent with the liberal standard required to be applied to amendments), so that
21 Plaintiff may allege with even more precision the specific misconduct Ashley has
22 engaged in for years, complete with the dates – spread out over years – that Ashley
23 has continued its misleading and purposefully conspicuous use of the term
24 "**PLUS**" for the express purpose of misleading Plaintiff's customers into
25 patronizing Ashley's stores instead of Plaintiff's stores.  Of course, that detail is
26 already available to Ashley, since Ashley pays to place these false and misleading
27 advertisements into interstate commerce.
28 / / / /

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

## IV.    LEGAL ARGUMENT

### A.    Plaintiff's Allegations, Taken as a Whole, Meet Rule 9(b).

As noted above, Plaintiff will respond to Ashley's motion *assuming* Rule 9(b) applies to its claims since Plaintiff acknowledges its claims do sound in fraud. To begin with, Rule 9(b) requires no more than that the defendant be provided fair notice of the conduct alleged to give rise to the plaintiff's claims – it does *not* require microscopic detail on each misleading act that gives rise to liability.

In *Bobbleheads.com, LLC v. Wright Brothers, Inc.*, 259 F.Supp.3d 1087 (S.D. Cal. 2017) – a case involving false advertising claims under the Lanham Act – this Court (Hon. Janis Sammartino) concluded that the plaintiff's allegations about false statements were sufficient because they generally alleged the misrepresentations at issue.  To that end, the complaint alleged that the defendants advertised Defendant Work 2 in response to the takedown notices, but actually shipped Defendant Work 1 to customers, and that they falsely represented their bobbleheads were the "official bobblehead doll of the 2016 Donald Trump Presidential campaign." (See *Bobbleheads.com, LLC*, *supra*, 259 F.Supp.3d at 1095-1096.)  The court rejected the defendant's claim that the plaintiff was also obligated to identify each offending shipment or the precise time frame of the shipments in question because the complaint, as a whole, adequately apprised the defendant of the conduct at issue and the defendant's own purchase invoices were presumed to reflect the specific times and dates of purchase at issue. (*Id.* at 1096.)

The only allegation the court found insufficient in *Bobbleheads.com, LLC* was the plaintiff's allegation that the defendant used plaintiff's pictures of its own bobblehead to sell Defendants' bobbleheads because plaintiffs merely alleged, without any identification of the manner of advertisement, that "Defendants have advertised their bobble head products using actual pictures of the Bobblehead Work." (*Ibid.*)  This "bare allegation," the court held, "is wholly insufficient under Rule 9(b)" and the granted that portion of the defendant's motion only. (*Ibid.*)

1    Here, Plaintiff has provided an exact cut and paste of the offending ads in
2  question and has also specifically alleged other misleading statements regularly
3  employed by Ashley within the ads cut and pasted into the Complaint to draw
4  customers into its doors, rather than Plaintiff's.  The Complaint even includes a
5  Better Business Bureau complaint, of which Ashley was surely already aware,
6  since it responded to the complaint; albeit in a manner the consumer found
7  unsatisfactory.  In either case, the Complaint specifically alleges the false and
8  misleading advertisements in question, which Ashley's own records are capable of
9  confirming where, when and how those representations were placed into interstate
10 commerce.  Indeed, Ashley is obviously aware of each publication in which it
11 publishes these same ads since it surely *pays* to do so and is presumably the best
12 source of the specifics Ashley disingenuously claims to need to defend itself.

13    Again, the purpose of Rule 9(b), to give the defendant fair notice of the
14 alleged fraudulent conduct so that they can adequately defend against the charge,
15 has undeniably been met here.  On that score, it should be noted that Ashley's
16 opposition effectively concedes it understands what representations Plaintiff has
17 alleged to be misleading – for it did not, it could not begin mounting the challenges
18 raised in its brief as to the adequacy of its claimed "disclaimers" and whether they
19 are sufficiently conspicuous (they plainly are neither).  But, as to the adequacy of
20 Ashley's disclaimers and whether or not they sufficiently disclose to customers the
21 misleading nature of the ads that are designed to attract their attention is a factual
22 matter that cannot be resolved on a 12(b)6 motion, as discussed below.

23    **B.    Plaintiff Has Sufficiently Alleged a Lanham Act Claim.**

24    Ashley next claims Plaintiff has failed to "sufficiently allege" a Lanham Act
25 claim because it does little more than recite the elements of such a claim.  Of
26 course, given the facially misleading nature of Ashley's ads and the undeniable
27 fact that Plaintiff is a direct competitor of Ashley, little more is needed since
28 Ashley's conduct and Plaintiff's resulting damages fit neatly within the elements of

1    a Lanham Act claim and damages are resumed given the parties' roles as direct
2    competitors.  In either case, the claim has been sufficiently alleged.

3        As Defendant acknowledges, with reference to *Newcal Indus., Inc. v. Ikon*
4    *Off. Sol.*, 513 F.3d 1038, 152 (9th Cir. 2008), a prima facie case under the Lanham
5    Act is established by showing that: "(1) the defendant made a false statement either
6    about the plaintiff's or its own product; (2) the statement was made in commercial
7    advertisement or promotion; (3) the statement actually deceived or had the
8    tendency to deceive a substantial segment of its audience; (4) the deception is
9    material; (5) the defendant caused its false statement to enter interstate commerce;
10   and (6) the plaintiff has been or is likely to be injured as a result of the false
11   statement, **either** by direct diversion of sales from itself to the defendant, or by a
12   lessening of goodwill associated with the plaintiff's product."

13       Plaintiff's Complaint easily alleges facts on each of the foregoing elements.
14   As to the first element, the Complaint alleges that Defendant has made specific
15   false and misleading statements – including the very ad cut and pasted into the
16   Complaint – about its "own products"; namely, the true price for which its
17   products are actually available to consumers. (See Complaint, at ¶ 20.)  The
18   example provided (which is substantively identical in numerous other ads that
19   Plaintiff is not required to detail in its Complaint) demonstrates that Ashley
20   misleadingly represented in the Union Tribune[5] that it offers "up to 50% off ***plus***
21   12 months of interest free payments," while Exhibit "A" to the Complaint touts
22   40% off ***plus*** 5 years of interest free payments and no down payment. (See Exhibit
23   "A" to Doc. No. 1.)  These ads are obviously "made in commercial advertisement
24   or promotion" since that is the obvious purpose of running an "ad" in the Union

25   _____

26   [5]       As for Ashley's proffered copy of what it claims to be the "same ad" that is in
27   Plaintiff's Complaint, the Complaint actually includes relevant detail that is not contained
     within Ashley's proffered copy; namely, the paper in which it was placed. (See Doc. No.
28   1, at ¶ 8, which – unlike Defendant's proffered copy – identifies the Union Tribune].)

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

1  Tribune, and Ashley is alleged to include the same statements on its website, which
2  satisfies the second element of this claim.

3      As for the third, Plaintiff alleges that Ashley's statements not only has the
4  tendency to deceive a substantial segment of its audience but that *it has done so*;
5  that is the clear import of the incorporated Better Business Bureau complaint, in
6  which a consumer made clear they *were deceived* by Ashley's ad, satisfying the
7  third element.

8      Ashley's deception is clearly material, since it causes ordinary consumers,
9  including the consumer who authored the BBB complaint incorporated into the
10  Complaint, to patronize Ashley's stores over Plaintiff's stores as a result of their
11  confusion which – the Complaint alleges – is the only way to learn the truth of
12  what Ashley's will honor at in its stores versus what it represents to the buying
13  public it will accept. This satisfies the fourth element of the Lanham Act and the
14  Complaint alleges that Ashley publishes these ads in interstate commerce,
15  including on its nationally-available website,[6] meeting the fifth element.

16      As for the sixth element, that Plaintiff "has been or is likely to be injured as
17  a result of" Ashley's false statements, "either by direct diversion of sales from
18  itself to the defendant, or by a lessening of goodwill associated with the plaintiff's
19  product," the Complaint alleges precisely that. Moreover, commercial injury is
20  generally *presumed* where, as here, "defendant and plaintiff are direct competitors
21  and defendant's misrepresentation has a tendency to mislead consumers."

22  

23  [6]   See *Neighborhood Assistance Corp. of Am. v. First One Lending Corp.*, 2012 WL
24  1698368, at *18 (C.D. Cal. May 15, 2012) [likelihood of success on interstate commerce
    element met where misleading statements "appear[ed] on websites available to anyone in
25  the United States."].) The Complaint alleges just such publications. (See Doc. No. 1, at
26  ¶¶ 8, 9, 21 ["In addition, some of Defendants' so-called 'disclaimers' do not show up at
    all on billboard advertising, and also do not appear on mobile viewing of their website.
27  Indeed, Plaintiff is informed and believes that Defendants have purposefully refrained
    from formatting their website specifically to avoid providing such disclaimers at all,
28  much less in a conspicuous fashion."] and 27.)

*TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 826 (9th Cir. 2011); see also *Lexmark Int'l, Inc. v. Static Control Components, Inc.* (2014) 572 U.S. 118, 138 ["diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising"].)

It is also well settled that, at the pleading stage, a plaintiff asserting injury under the Lanham Act must merely allege "an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." (*Luxul Tech. Inc. v. Nectarlux, LLC*, 78 F.Supp.3d 1156, 1170 (N.D. Cal. 2015) [citation omitted].)  There could hardly be a clearer example of that injury than a direct competitor using false and misleading ads to draw customers into their store rather than its competitor's.

It bears noting that Plaintiff has alleged Ashely made *literally* false statements regarding in its advertisements, including the representation that their customers could expect to receive a percentage off "PLUS" interest-free payments, when, in fact, customers would receive only one or the other but not both. (See Complaint at ¶ 9.)  Plaintiff has further alleged that Defendants to not make that disclosure until customers are already in their stores, at a time when they are less likely to leave and start over somewhere else, such as Plaintiff's stores. (Ibid.) Given Ashley's *literally* false statements in its ads, the law *presumes* customers relied upon them and were deceived. (See *Avid Identification Sys., Inc. v. Schering–Plough Corp.*, 33 Fed.Appx. 854, 856 (9th Cir. 2002) ["Because these representations were literally false, the statements carry with them the presumption that consumers relied on and were deceived by them."].)  As such, Plaintiff's Complaint sufficiently alleges its Lanham Act claims under both theories of recovery.

It should also be noted that even apart from Plaintiff's alleged individual injuries and available remedies, the public interest is served by an injunction to prevent consumer confusion and misleading advertising. (*Stark v. Diageo Chateau*

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

1  & *Estate Wines Co.*, 907 F.Supp.2d 1042, 1067 (N.D. Cal. 2012) ["Preventing
2  consumer confusion serves the public interest"]; *Church & Dwight Co., Inc. v.*
3  *S.C. Johnson & Son Inc.*, 873 F.Supp. 893, 912 (D.N.J. 1994) [granting injunction
4  preventing defendant from deceptive advertising and stating that "the public has a
5  right not to be deceived or confused."].) As such, Plaintiff has sufficiently alleged
6  a valid Lanham Act claim even apart from its own recoverable damages and
7  entitlement to injunctive relief.

8              **1.)   Ashley's "Disclaimers" Present, at Best, a Factual**
9                      **Dispute for Trial, But Do Not Cure its False and**
                       **Misleading Advertisements.**
10

11         As for Ashley's suggestion that its purported "disclaimers" – which do not
12  appear in the advertisement within the Complaint and which *barely* appear in the
13  different form of advertisement proffered by Defendant – clarify and render its
14  representations factually accurate, the law holds otherwise. It is well settled law
15  that a "disclaimer" is not effective where, as here, it is hidden. (*23andMe, Inc.*,
16  *supra*, 356 F. Supp. 3d at 909 [a footnote that was "essentially buried" could not
17  cure a deceptive advertisement].) Here, the misleading ad in question prominently
18  features – in gigantic font color-contrasted and obviously designed to draw a
19  consumer's eye – the terms "50% off" *PLUS* "12 MONTHS No interest if paid in
20  full in 12 months." (See Doc. No. 15-3, at p. 1.) Defendant's purported
21  "disclaimer" is buried at the very bottom of the *second page* of the ad in question
22  in almost imperceptible font – particularly when contrasted against the balance of
23  the ad and its more prominent terms. (See Doc. No. 15-3, at p. 2.)

24         As importantly, none of the language in the proffered "disclaimers" actually
25  informs the consumer that the consumer may enjoy *either* 50% off *or* "12 months
26  without interest," but *not both*. Indeed, if one studies the "disclaimers" alleged to
27  relate to each representation, each is address separately but nowhere do the
28  "disclaimers" purport to inform the consumer that they may enjoy *either* up to 50%

off *or* 12 months of interest-free payments but not both.   Instead, Ashley's misleading use of the term "plus" affirmatively suggests they can receive "both." The closest Ashley can claim to come to clarifying its misrepresentation appears after the disclaimer identified with the following symbol: "‡‡," which is identified as applying to the "50% OFF" representation, and in which Defendant states, in small, inconspicuous font on the next page: "Cannot be combined with any other promotion or discount." (See Doc. No. 15.3, at p. 2.)

However, even ***that*** purported "disclaimer" is not clear – it does not state, for instance, "Cannot be combined with the 12 Months interest free offer advertised above that is visually combined with this offer by use of the term '**PLUS**'."   In fact, to be accurate, Ashley's disclaimer would essentially have to state – ***prominently***, rather than as it currently does buried in the fine print on the second page of the ad – that "the advertisement on the foregoing page is false, you will not receive 50% off plus 12 months of interest free interest because our contrary statement is simply false."   Obviously, Ashley's disclaimer does not say that.

At best, Ashley's dizzying array of inconspicuous and internally inconsistent "disclaimers," when contrasted against its oversized statements in its ads, do nothing but baffle the ordinary consumer who actually bothers to search for it at the bottom of the second page of a two-page ad.   This comes nowhere close to demonstrating a true "disclaimer" that could, arguably, cure an otherwise misleading advertisement.   At best, Ashley has presented a future evidentiary dispute at trial, but not a defense as a matter of law.   However, the evidentiary showing required of a Lanham Act plaintiff at trial "is not required to survive a motion to dismiss." (*Clorox Company v. Reckitt Benkiser Group, PLC*, 398 F.Supp.3d 623, 636 (N.D. Cal. 2019.)   Instead, actual deception is a question of fact, and at the pleading stage the plaintiff need only allege specific misleading statements and explain why they are misleading in accordance with Rule 9(b).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

1    (*Ibid.*)  As in the *Clorox* case, and considering the facts in the light most favorable

2    to Plaintiff, as the Court must, Defendant's purported "disclaimers" "cannot be

3    found to cure the misleading nature of the advertisement as a matter of law."

4    Instead, the likelihood of confusion on these facts presents a ***factual call*** that may

5    not be resolved at the pleading stage.

6         Moreover, and even if the Court finds Ashley's ads were merely misleading,

7    rather than literally false, a Lanham Act claim nonetheless lies where the

8    statements were actually conveyed to consumers and at least some consumers were

9    actually deceived. (*JHP Pharmaceuticals, LLC v. Hospira, Inc.*, 52 F.Supp.3d 992,

10   1003.)  And, in meeting that pleading burden, the plaintiff does not have to present

11   actual *evidence* of consumer confusion at the pleading stage; the court can and

12   must accept allegations of consumer confusion. (*Id.* at 1003; *Clorox Company*,

13   *supra*, 398 F.Supp.3d at 623.)  The only circumstance under which a Court may

14   dismiss a Lanham Act claim is where, as a matter of law, "no reasonable

15   consumer" would be mislead by the advertisement given all the facts presented.

16   (*Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).)

17        Clearly, this is not such a case, since Ashley's purported "disclaimers" are

18   far from conspicuous and anything but clear; particularly within the context of its

19   claim – in its brief – that its disclaimer adequately explains that its advertised terms

20   will not be honored.  And, Plaintiff has expressly alleged not only that these ads

21   were conveyed to consumers, through the Union Tribune and otherwise, but has

22   already presented evidence that consumers were actually deceived. (See

23   Complaint, at ¶ 10.)  Much like the plaintiff in *Clorox Company*, Plaintiff has

24   "plausibly explained how Reckitt's advertisements could be misleading to

25   consumers under the Lanham Act." (*Clorox Company v. Reckitt Benckiser Group*

26   *PLC*, 398 F.Supp.3d 623, 647 (N.D. Cal.  2019).)  As such, Ashley's motion to

27   dismiss should be denied.

28   / / / /

---

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

C.     **Plaintiff Has Sufficiently Alleged Each of its UCL Claims.**

The UCL prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." (Cal. Bus. & Prof. Code § 17200.) An "unlawful" practice under the UCL is "anything that can properly be called a business practice and that at the same time is forbidden by law." (*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999) [internal quotation marks omitted].) The "unfair" prong of the UCL "prohibit[s] not only advertising which is false, but also advertising which[,] although is true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." (*Brady v. Bayer Corp.*, 26 Cal. App. 5th 1156, 1173, 237 Cal.Rptr.3d 683 (2018) (citation omitted). The FAL prohibits "untrue or misleading" advertising "which is known, or which by the exercise of reasonable care, would be known to be untrue or misleading." (Cal. Bus. & Prof. Code § 17500.)

Here, Ashley's conduct falls squarely into all three baskets of actionable misconduct, which is why each is listed within Plaintiff's second claim for relief. As for Ashley's suggestion the "nine paragraphs supporting this claim for relief do not provide any guidance as to whether the claim arises under one or all five of the theories mentioned," it appears Ashley has overlooked the fact that Paragraph 30 incorporates by referenced the twenty-seven paragraphs that precede them, and which provide all the guidance Ashley could hope to need on this subject. And, because none of Ashley's proffered "defenses" warrants the dismissal of Plaintiff's claim as pled, its motion to dismiss Plaintiff's second claim should be denied.

a.     **Plaintiff Has Standing to Sue Under Both the UCL and FAL.**

Ashley's first argument, that the reliance of its customers upon Ashley's false advertising to Plaintiff's competitive disadvantage is not sufficient to bestow standing upon Plaintiff to sue for its resulting injuries finds no support in Ashley's

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

cited authorities.   Instead, in *Kwikset Corp.* cited by Ashley, the California Supreme Court was actually discussing *causation*, and not "reliance" as an element to recovery under the UCL.   To that end, the Court observed that "a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct," but made clear that a "plaintiff is not required to allege that the challenged misrepresentations were the sole or even the decisive cause of the injury-producing conduct." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 326-327.)

The California Supreme Court has repeatedly held that the purpose of the UCL is to protect "both consumers *and competitors* by promoting fair competition in commercial markets for goods and services." (*Kwikset, supra,* 51 Cal.4th at 320 [quoting *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949 [*emphasis* added].)   In "service of that purpose, the Legislature framed the UCL's substantive provisions in 'broad, sweeping language'" and "the state's false advertising law (§17500 et seq.) is equally comprehensive within the narrower field of false and misleading advertising." (*Kwikset, supra,* 51 Cal.4th at 320.)

Nowhere does *Kwikset* stand for the proposition that a plaintiff lacks standing to sue for the competitive injury caused it when its direct competitor uses false and misleading advertising to divert the plaintiff's customers away from it. In fact, the law is to the contrary.   "[T]o state a claim under either the UCL or the FAL, based on false advertising or promotional practices, 'it is necessary only to show that '*members of the public* are likely to be deceived.'" (*Veera v. Banana Republic, LLC* (2016) 6 Cal.App.5th 907, 914-915 [quoting *Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 226 and citing *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 312] [*emphasis* added].)

Indeed, *Banana Republic* directly repudiates Ashley's attempt to limit the holding of *Kwikset*.   There, the court of appeal explained "private standing is limited to any 'person who has suffered injury in fact and has lost money or

property' as a result of unfair competition'" or false advertising. (*Veera*, *supra*, 6 Cal.App.5[th] at 915 [quoting *Kwikset*, *supra*, 51 Cal.4th at pp. 320–321].)  But, again reiterating the *Kwikset* Court's emphasis on **causation**, the *Veera* court explained: "The phrase 'as a result of' in its plain and ordinary sense means 'caused by' and requires a showing of a causal connection or reliance on the alleged misrepresentation." (*Veera*, *supra*, 6 Cal.App.5[th] at 915-916.)  It does **not** mean that the only way a plaintiff can suffer actionable injury is to have directly relied on a false or misleading ad; instead, it expressly extends to any person or entity harmed by such ads, including a competitor, provided that the plaintiff shows it established a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that the economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." (*Kwikset*, *supra*, 51 Cal.4th at 322.)

Here, Plaintiff is required only to show that Ashley's false and misleading advertising has "caused damage" to Plaintiff because "member of the public are likely to be deceived" by Ashley's ads, causing damage to Plaintiff when they are enticed into Ashley's stores instead of Plaintiff's stores.  That is precisely what Plaintiff has alleged, and the allegation sufficiently states a claim under the UCL and FAL.

### b.   Defendant's "No Adequate Remedy" Argument Ignores the Law of Alternative Pleading.

Ashley next argues that Plaintiff may not assert an entitlement to injunctive relief because its allegation of economic injury precludes its ability to demonstrate the inadequacy of monetary relief.   The argument not only ignores Plaintiff's expressly alleged entitlement to such relief because of the potential inability to readily ascertain the amount of its damages (see Complaint, at ¶ 38), it also ignores the public's interest in injunctive relief, which independently warrants injunctive relief – including permanent injunctive relief – under the specified sections of the

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

1   Business & Professions Code. (*Stark v. Diageo Chateau & Estate Wines Co.*, 907
2   F.Supp.2d 1042, 1067 (N.D. Cal. 2012) ["Preventing consumer confusion serves
3   the public interest"].)   Whether injunctive relief is ultimately awarded under the
4   Lanham Act and/or the UCL or FAL, the public's interest in preventing consumer
5   confusion undeniably supports Plaintiff's alleged entitlement to injunctive relief.

6       Moreover, and with respect to Ashley's citation to *Sonner v. Premier*
7   *Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), 1081 (9th Cir, 2020), in *Sonner*, the
8   plaintiff sought, on the eve of trial and after more than four years of litigation, to
9   secure a bench trial under the UCL by foregoing CLRA damage claims that had to
10  be tried to a jury and seeking the same damages as "equitable restitution" instead.
11  (*Sonner*, *supra*, 971 F.3d at 837.)   It was because of the procedural posture of that
12  case that the Ninth Circuit Court refused to permit a tactical conversion of an
13  otherwise jury trial into an equitable proceeding that the Court refused to allow
14  such gamesmanship.   The same cannot be said of this case, where Plaintiff has
15  expressly alleged the lack of an adequate remedy at law and alternative and even
16  inconsistent theories of relief are appropriately asserted. (*Carter v. Mitchell*, 693
17  F.3d 555, 566; *Ayers v. United States*, 277 F.3d 821, 829 (6th Cir. 2002 [alternative
18  pleadings are not disfavored].)

19                 **c.**    **Plaintiff Has Undeniably Alleged *Unfair* Competition.**

20      Separate and apart from the unlawful and fraudulent prongs of the UCL, it is
21  beyond dispute that a plaintiff need not demonstrate that he or she was directly
22  deceived by the alleged misrepresentation to recover under the *unfair* prong.
23  (*23andMe, Inc. v. Ancestry.com DNA, LLC*, 356 F. Supp. 3d 889, 9011 (N.D. Cal.
24  2018).)   Instead, courts reason that a defendant's unfair business practices can
25  threaten or harm competition even without directly deceiving its competitors. (*Id.*
26  [citing *Cel-Tech*, 20 Cal. 4th at 186–87; *In re Tobacco II Cases* (2009) 46 Cal. 4th
27  298, 325 n.17].)
28  / / / /

As for Ashely's repeated suggestion that the misconduct at issue must be independently violate antitrust laws to be actionable under the "unfair" prong, none of Ashley's cited cases so provides.  Instead, to state a claim under the UCL's "unfair" prong, the allegedly unfair conduct must merely be "tethered to some legislatively declared policy *or* proof of some actual or threatened impact on competition." (*Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136 (9th Cir. 2014).)  Here, Business & Professions Code section 17508 expressly provides that "[i]t shall be unlawful for any person doing business in California and advertising to consumers in California to make any false or misleading advertising claim...."  There could hardly be a more clearly tethered legislatively declared policy applicable to Ashley's conduct and, as such, this argument fails as well.

### d.    Plaintiff is Entitled to Restitution Given the Facts Pled.

Ashley's "attack," such as it is, on Plaintiff's entitlement to restitution amounts to little more than linguistic gymnastics.  It reasons "restitution" is limited to profits that Plaintiff would have earned but for Ashley's false and misleading advertising, but not to "profits" earned by Ashley from its conduct in which Plaintiff has no legitimate interest.  In *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, the California Supreme Court made clear, by way of a citation to its earlier decision in *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th at 127, that a plaintiff in an UCL action is entitled to an order of restitution, defined as an order "compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." (*Korea Supply Co.*, *supra*, 29 Cal.4th at 1144-1145.)

Here, Plaintiff has sufficiently alleged that Ashley's false and misleading advertising has diverted its customers to Ashley *and* that Plaintiff historically sells furniture and home furnishings to a large percentage of the customers that enter its

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

1   doors. (See Doc. No. 1, at ¶ 26 ["Plaintiff historically realizes a high percentage of
2   sales from the customers who physically visit Plaintiff's stores...."].) This
3   allegation, together with the asserted effect of Defendants' diversion of those same
4   customers to Ashley, clearly entitles Plaintiff to recover an order of restitution,
5   restoring to it the profits it would have earned from those customers that were
6   diverted to Ashley's stores.  As such, Ashley's "motion to dismiss" Plaintiff's
7   claimed entitlement to restitution must be denied.  Separating what constitutes true
8   "disgorgement" from restitution is not a proper task to perform at the 12b6 stage.

9                **e.      Plaintiff Has Sufficiently Alleged a UCL Claim.**

10          As for Ashley's suggestion the Court should "dismiss" Plaintiff's common
11  law claim for unfair competition, they base the argument on the assertion that
12  *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008) limits the
13  tort of common law unfair competition to "passing off" one's goods as those of
14  another or exploitation of trade names or trademarks. (See Dft's Mtn., at 16:12-
15  21.)   However, *Sybersound Records, Inc.* observed no more than that, with
16  reference to a California Supreme Court opinion, the "common law tort of unfair
17  competition is generally thought to be synonymous with the act of 'passing off'
18  ones goods as those of another." (*Sybersound Records, Inc., supra*, 517 F.3d at
19  1153 [citing *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, at 1262.)

20          However, in *Bank of the West*, the Supreme Court was dealing with the term
21  "unfair competition" within the context of an insurance coverage dispute, and
22  whether that term in a position was limited to common law claims or included
23  other statutory claims for unfair competition. (*Bank of the West, supra*, 2 Cal.4th at
24  1262-1263.)   The Court also noted, however, that the statutory claims for unfair
25  competition (such as Business & Professions Code section 17200, et seq.) evolved
26  not because the common law claims were *limited* to "passing off" or trademark
27  infringement, but because the "common law tort of unfair competition, which
28  required a showing of competitive injury, did not provide an effective remedy for

consumers." (*Bank of the West*, *supra*, 2 Cal.4th at 1264.)  The Court has made clear elsewhere that the "term 'unfair competition' receives a broad definition" and "Historically, the tort of unfair business competition required a *competitive* injury." (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 209 [citations omitted, *emphasis* in original].)

This case involves entirely competitive injury, and "unfair competition" is not *limited* only to "passing off" another's goods or trademark infringement – rather, the Supreme Court was merely evaluating the "reasonable expectations of an insured" through use of the undefined term "common law" in a setting that does not apply here, in a case consisting entirely of competitive injury as a result of conduct that is false and misleading at common law.  As such, Ashley's attempt to contradict the Supreme Court's guidance on this term should be rejected.

## V.     CONCLUSION

Based on the foregoing, and because Plaintiff's Complaint plainly places Ashley on notice of the conduct it is accused of such that it can – and already has – begun mounting a defense beyond a mere denial, Ashley's motion to dismiss must be denied.  In the unlikely event the Court concludes any of Ashley's arguments have merit, Plaintiff must be afforded leave to amend.

Dated: December 11, 2020          VIVOLI SACCUZZO, LLP


                                             By: /s/ Michael W. Vivoli
                                                   MICHAEL W. VIVOLI
                                                   Attorneys for Plaintiff,
                                                   JEROME'S FURNITURE WAREHOUSE

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT