1 | MICHAEL W. VIVOLI (Bar No. 184366)
2 | mvivoli@vivolilaw.com
    VIVOLI SACCUZZO, LLP
3 | 3104 Fourth Avenue
    San Diego, California 92103
4 | (619) 744-9992 (Tel)
5 | (619) 744-9994 (Fax)

6 | Attorneys for Plaintiff,
7 | JEROME'S FURNITURE WAREHOUSE

8 | **UNITED STATES DISTRICT COURT**

9 | **SOUTHERN DISTRICT OF CALIFORNIA**

10 |

| | |
|---|---|
| JEROME'S FURNITURE WAREHOUSE, a California Corporation,) | Case No.: 20-cv-1765-GPC-BGS |
| Plaintiff, | **SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| vs. | **[15 U.S.C. § 1125(a)(1)(B)]** |
| ASHLEY FURNITURE INDUSTRIES, INC., a Wisconsin Corporation; and DOES 1 through 50, inclusive, | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff JEROME'S FURNITURE WAREHOUSE ("Plaintiff") brings this action against the Defendants named herein for damages and injunctive relief under the laws of the United States of America and the State of California as follows:

**SUBJECT MATTER JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction over the claims in this action which relate to false advertising in violation of Section 43 of the Lanham

1

Act, codified at 15 U.S.C. § 1125(a)(1)(B), and by virtue of the diversity of citizenship that exists between the parties pursuant to 28 U.S.C. § 1332(a). Further, with regard to Plaintiff's common law and statutory California claims, this Court has supplemental jurisdiction under 28 U.S.C. § 1367.

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a), (b) and/or (c). The false advertisements and false and/or misleading commercial statements at issue in this action were purposefully made within the Southern District of California and were directed at consumers within this District, within which Defendants maintain multiple retail outlets and the claims alleged in this action arose within the same District.

## PARTIES AND PERSONAL JURISDICTION

3. Plaintiff is, and at all times relevant herein was, a corporation duly formed within the State of California in 1955 and has been maintained at all times thereafter through and including the present.

4. Defendant ASHLEY FURNITURE INDUSTRIES, INC. ("Ashley") is a corporation formed under the laws of the State of Wisconsin. Ashley registered to do business in the State of California in November of 1987, and has regularly conducted business within the State of California since at least 1987, including within the Southern District of California, where it maintains multiple retail distribution centers, and for which it widely and purposefully distributes the false and misleading commercial statements and advertisements that give rise to this action, as set forth below.

5. Defendant STONELEDGE FURNITURE, LLC ("Stoneledge") is a limited liability company formed under the laws of Wisconsin. Stoneledge is believed to be the owner of all "Ashley Home Stores" within the Southwestern United States through the furniture manufactured and/or imported by Ashley is sold, using the false advertising and other unlawful business practices described herein.

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

6. Defendant Ashley Global Retail, LLC ("AGR") is a Wisconsin limited liability company that serves as the Managing Member of Stoneledge and, in that capacity and by virtue of its own tortious actions, is liable for the tortious acts of Stoneledge at issue herein. The term "Defendants" as hereinafter used, applies to Defendants, Ashley, Stoneledge and AGR.

7. In addition to Ashley, Stoneledge and AGR, Plaintiff is informed and believes Ashley has formed, maintained and utilizes a web of other corporate entities designed to conceal Ashley's involvement and/or liability through a shell game calculated to insulate itself from liability for its own tortious actions. Plaintiff is currently ignorant of the names and specific involvement of all of these entities but will amend this complaint to name and to identify their specific involvement in the conduct at issue herein after obtaining discovery of their names and involvement. For purposes of this Complaint, the term "Defendants" will refer collectively to Ashley and to each of its subsidiary entities through which it engages in the conduct alleged herein.

8. Plaintiff is ignorant of the true names and capacities of Defendants DOE 1 through 50, inclusive, and by reason thereof sues said Defendants by their fictitious names. Plaintiff will seek leave of court, if necessary, to amend this Complaint to allege the true names and capacities of these fictitiously-named Defendants when their identities are fully and finally ascertained.

9. Ashley, Stoneledge and AGR, along with DOES 1 through 50 (collectively "Defendants") have acted as the principal, agent, employee or other authorized representative in relation to the other; all Defendants acted at all times mentioned in this Complaint within the course and scope of their respective authority and with the full knowledge and consent of the other Defendants. Furthermore, Plaintiff is informed and believes and based thereon alleges that all acts of corporate employees as hereinafter alleged were authorized and/or ratified by a trustee, officer, director or managing agent of each other defendant.

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## NATURE OF THIS ACTION

10.    Plaintiff has proudly and faithfully served retail customers looking for quality furniture and home furnishings at a fair price since 1954. When Plaintiff opened its first store in downtown San Diego, it purposefully elected to forego the expense of a "flashy" storefront and instead used the savings realized from its modest business location to offer quality furniture and home furnishings to retail customers at the best prices possible. Over the decades that have followed, Plaintiff has continued to model its business behind the basic premise that reliably offering customers a quality product and outstanding customer service at the lowest prices possible is the best way to build and foster customer loyalty and to generate repeat business.

11.    Throughout Southern California and beyond, Plaintiff has built its brand and resulting customer goodwill around the foregoing basic, underlying business model and philosophy; through and including such well known concepts as "Jerry's price," which the consuming public has come to recognize as reflecting a no-haggle price at which customers can expect to purchase furniture and home furnishings with confidence that the price stated reflects a fair and honest price, with no hidden fees or hidden terms disclosed only after entering Plaintiff's stores and selecting merchandise.

12.    Ashley and the other Defendants, on the other hand, have employed a far different business practice through their "Ashley" stores and it is a business practice that has harmed not only the buying public across the country against whom Defendants purposefully direct their unlawful practices, but also Plaintiff by deceiving Plaintiff's customers into patronizing Defendants' Ashley stores through false advertising, rather than Plaintiff's stores or the stores of other retailers who engage in honest advertising. Unlike Plaintiff, which consistently offers the best overall price on quality merchandise without hidden or misleading advertised payment terms, Defendants, as an admitted business practice, engage in materially

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

misleading advertising practices purposefully designed and specifically intended to deceive customers into falsely believing that Ashley offers prices and finance cannot be beaten by Plaintiff or any other competitor.

13. Notably, Ashley's false and misleading advertising practices have long been the source of litigation against it, including an action by the State Attorney General for the State of Arizona, which resulted in a civil complaint and, later, a consent judgment against Ashley's regular practice of using false, inaccurate and/or inadequate disclaimers about the terms of its sales. A true and correct copy of that consent judgment, with which Ashley agreed in writing to comply, is attached hereto as **Exhibit "A."**

14. Pursuant to Section C(8) of Exhibit "A" hereto, under the "General Requirements," of the attached consent judgment, Defendants agreed that "If a disclaimer or disclosure is necessary in any part of an advertisement, it shall be made in a manner, with respect to the type of medium used for the advertisement, that it is ***noticeable, readable***, and understandable by ordinary consumers to whom the advertisement is directed...." (***Emphasis*** added.) However, the advertisements at issue herein do not comply with the foregoing agreement. Instead, as explained below, many of Defendants' false and misleading advertisements are either not cured by adequate disclaimers because they appear, if at all, buried in microscopic font on the second page of the ads, or because misleading statements – including billboard ads regularly used by Defendants – do not contain any disclaimers at all, but a noticeable, readable disclaimer is required to necessary to make the statements true, or at least not outright misleading.

15. In addition, pursuant to Section E(22) of the attached consent judgment, under the heading "Advertising," Defendants agreed that, "In any advertisement, Southwestern shall not use terms such as 'sale', 'discount', 'savings', or 'savings event', unless this is in fact true. Those terms may relate to the selling price of individual items, as well as other reductions, such as offers of

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

reduced finance terms, offers to sell a second item of merchandise at a reduction from Southwestern's regular price, and offers to sell a package of merchandise at a total price less than the sum of Southwestern's own regular price." Again, however, the false and misleading advertising practices identified herein fail to comply with the foregoing terms, in that Defendants habitually use the term "sale" when the use of that term is false, and Defendants also misleadingly represent that the terms of its "sales" are valid for a limited time when, in fact, the "sale" price offered is, in truth, Defendant's regularly advertised price and, in many instances, a "sale" price is based on Defendants' deliberate overstatement of the "regular price" of that item purely to enable Defendants to represent a "sale price" that either does not exist, and/or which is grossly overstated.

### DEFENDANTS' MISLEADING ADVERTISEMENTS

**A.    Defendants' Misleading Use of the Term "Plus."**

16.    From July 28, 2020 through August 10, 2020, Defendants widely distributed within San Diego County and beyond the following print advertisement, in an overt attempt to mislead consumers throughout San Diego County and Southern California that they expect to receive 40% off the regular price of all of Ashley's merchandise *plus* 60 months of interest-free payments on purchases made with that price reduction with no down payment and no minimum payment required on their purchase to receive the advertised discount:

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF



17.     The foregoing advertisement misleadingly represented to the consuming public, including Plaintiff's loyal customer and customer base, that Ashley would honor 40% off its regularly advertised prices for all of its merchandise **and** afford consumers 60 months to pay off their 40% discounted purchase, free of interest, with no down payment and no minimum purchase required on any such purchases.  However, what Defendants did not disclose in their ad, and which they never disclose until the customer is on the sales floor of Defendants' stores and usually only after they have selected merchandise to buy, is that Defendants will honor **either** 40% off already inflated prices **or** afford consumers sixty months to pay off their purchases, ***but not both***.

18.     Defendants also do not disclose on the face of its ads that much of, or even most of the merchandise within Defendants' stores has already been excluded from participation in the terms of the advertised sale, without disclosure before

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

visiting Defendants' stores, because of on-site "manager's specials" and/or other exclusions discoverable only in Defendants' stores but not in their ads that Defendants then use to "void" the advertised sale through its inconspicuous disclaimer, at the bottom of the second page of its ad, in cartoonishly small font, that its advertised terms "Cannot be combined with any other promotion or discount." Importantly, consumers would only be able to discover these exclusions upon visiting Defendants' stores, *even assuming* such bothered to read the microscopic fine print hidden at the bottom of the second page of Defendants' ads.

19. In some of Defendants' ads, they will feature specific pieces of furniture as "examples" of discounted pieces that consumers may purchase, via interest-free payments, over the course of an identified number of months. However, what Ashley does not disclose – and never discloses in its ads – is that the purportedly discounted merchandise on the face of its ads deliberately *inflates* Defendants' "regular prices" for the goods advertised to back into a percentage "discount" in what amounts to a patently false discount, which among other things violates the guidelines of Federal Trade Commission concerning advertised discounts, including 16 C.F. R. § 233.1(a) and 16 C.F.R. § 233.3.

20. In addition to the foregoing, when consumers enter Defendants' stores and select merchandise for purchase that does facially "qualify" for Defendants' advertised sale (meaning, merchandise that is not pre-excluded from the promotion through "discounts" placed only on the salesfloor and not discoverable until visiting Defendants' stores), the consumers are then informed the "plus" between, for example the "40% off" and "60 Months" of free interest does *not* mean the consumer may enjoy both sales features, but that, instead, they may have one or the other based on the "disclaimer" that the percentage-off offer "Cannot be combined with any other promotion or discount." However, to the ordinary consumer, "40% off *plus* 60 Months of free interest" means the consumer can expect to receive *both* 40% off *and* 60 Months of free interest, since the common understanding of "plus"

means the first sales term *and* the second sales term; not "one *or* the other." Defendants are aware ordinary consumers understand the term "plus" to mean both, and deliberately use the term "plus" to mislead and draw consumers into their stores; fully aware the consumers misperceive they will enjoy both 40% off *and* 60 months of free interest on their purchase. As for their proffered "disclaimer," buried at the bottom of the second page of their ads, it fails to cure the deceptive nature of Defendants' use of the word "plus."

21. Plaintiff is informed and believes Defendants claim that their "disclaimers" buried at the bottom of the second page of their ad constitutes an adequate "disclaimer" against liability for their false and misleading advertisements prominently placed, in giant font, on the front of the ad. However, Defendants' "disclaimers" are neither conspicuous nor adequate, but are instead purposefully placed in an inconspicuous place, almost always at the bottom of the second page of their ads, beneath even Defendants' various store locations, in a font that is difficult or impossible for consumers to read. As a result, Plaintiff is informed and believes that customers are not told the true terms of purchase until they are already in Defendants' stores and often after they have already selected merchandise (believing both sale terms will be honored, only to be presented with a bill that excludes those terms). By that time, Defendants' false and misleading ads have already served the primary purpose for which they were designed – to drive foot traffic to Defendants' stores where they attempt to negotiate a sale on terms as far as possible from the terms offered in their ads (e.g., 40% off *plus* 60 months of interest free payments, or whatever combination Defendants are offering at that particular time).

22. The foregoing advertisement is but one example of a materially misleading ad that Defendants routinely employ within various means of print advertising, always with the same underlying misrepresentation about honoring a percentage off *plus* interest-free payments, which Defendants misleading suggest –

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

by not clearly saying otherwise – will apply to the purchase of all of its inventory when much of its inventory is pre-excluded from the sale through "manager specials" other minor "discounts" placed on the merchandise only on the sales floor. Another example of yet another ad run by Defendants is **Exhibit "B"** attached hereto, which is a true and correct copy of another misleading advertisement run by Defendants on September 4, 2020, in the Union Tribune.

23. The foregoing ads are materially identical to other false and misleading advertisements routinely used by Defendants in both print advertising and on their website to confuse and deceive consumer into believing they will receive *both* a percentage off any purchase at Ashley *plus* interest-free payments on their purchase of their choice of Defendant's entire inventory when, in fact, much of Ashley's inventory is already pre-excluded from the terms of sale advertised and consumers are told when they attempt to purchase merchandise that they may have a percentage off *or* interest-free payments, but not both.

24. Moreover, and without regard to the fact Defendants' proffered "disclaimers," which are routinely hidden on the second page of their ads, below even the various locations of their stores and in font that is difficult to see much less read, are not conspicuous even when they are inserted in Defendants' ads, but Defendants regularly maintain the same form of blatantly misleading advertising depicted above *without* any form of disclaimer.

25. For instance, on **December 26, 2020** and for days and/or weeks both before and after December 26, 2020 (detail known only by Defendants, since they maintain detailed records of their advertising and each of the locations where they post each such ads), Defendants ran the following conspicuous ad on the face of a very large billboard along the Interstate 15 freeway near the Ontario exist in Corona, California (obviously designed to be seen by thousands of consumers as they traveled that stretch of freeway):

/ / / /

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF



26. The billboard ad above – the content of which is materially identical to advertisements placed on other billboards by Defendants throughout Southern California and the rest of the country (and thus within interstate commerce) – contains no observable disclaimers of any kind. It also does not disclose any limitations on the sale or disclose to consumers any exclusions to the offer based on any particular merchandise. Instead, this billboard and others like it misleadingly represent to the buying public that consumers will receive both 50% off the regular advertised purchase price of *all* of Ashley's merchandise *plus* thirty-six (36) months interest-free payments on those purchases without qualification or exception. Defendants make this misrepresentation despite the fact Defendants routinely refuse to honor *both* sales features (particularly for lengthy finance terms combined with substantial discounts on price) and purport to "exclude" most of its inventory from the terms of the offer within its stores in a way that is only discoverable in their stores. And, again, Ashley deliberately uses the term "plus" recognizing that the average consumer understands "plus" to mean

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

that the consumer may enjoy the first sale feature *plus* the second sale feature because that is the common and ordinary understanding of the word "plus."

27. Ashley's billboard ad above is materially identical to other billboards it maintains throughout San Diego County, Southern California and around the country, and it is also identical to the "headline" portion of the ads it routinely runs in the San Diego Union Tribune (including Exhibit "B" attached hereto) and other publications, with varying percentages off and varying terms of interest-free payments. Defendants' billboards actually confuse and deceive, or have the tendency to and are likely to confuse and deceive, an appreciable number of relevant consumers and members of the trade into believing they will receive discounts on all of Defendants' inventory that Defendants, in truth, have no intentions of honoring.

28. Defendants' false and misleading statements are material and likely to influence the purchasing decisions of actual and prospective purchasers of the merchandise sold both by Defendants and Plaintiff by misleading consumers into believing they will receive to sale features when they will not and, as a result, have a tendency to induce consumers into patronizing Defendants' stores rather than Plaintiff's stores.

29. Defendants are well aware that their advertisements actually confuse or deceive, or have the tendency to and are likely to confuse and deceive, an appreciable number of relevant consumers and members of the relevant trade, and they have known so for years. In fact, Ashley's means and methods of deceiving the consuming public represents Ashely's purposefully established and deliberately adopted business practice of confusing and misleading consumers with its false advertisements so these customers physically visit Defendants' stores. As evidence of that institutional recognition, Kerry Lebensburger, Ashley's Senior Vice President of business Development, regularly and internally coaches Defendants to engage in recognized methods of confusing and deceiving members

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

of the buying public into patronizing Defendants' stores. Mr. Lebensburger's internal communications openly reveal Defendants' recognition that their false advertising is likely to confuse members of the consuming public. To that end, in a November 17, 2020, internal communication, Mr. Lebensburger wrote to Defendants' various retail chains, in an effort to emphasize the benefits of Defendants' misleading advertising while concealing "disclaimers" in fine print: **"80% read the headline, only 20% of those then read the content."** Mr. Lebensburger's statement explains why Defendants' headline never includes the fine print, and why Defendants instead bury its purported but confusing, contradictory and inadequate "disclaimers" at the bottom of the second page of its ads.

30.    Mr. Lebensburger's statement also reflects Defendants' recognition and resulting company policy that consumers seldom, if ever, check the fine print in ads (even where it is not hidden, as it always is in Defendants' ads, in terms that Defendants claim effectively negate the material features of its advertised sale) before patronizing stores to capture the perceived "benefit" of an advertised sale. The statement also reveals why Defendants routinely run blatantly misleading "headlines" to its ads – through and including the misleading us of the term "plus" when Defendants routinely refuse to honor both sales features – while burying its purported "disclaimers" in unreasonably small font on the second page of its ads, if at all, and only in terms that are internally confusing.

31.    As yet further evidence that Defendants' misleading ads are designed to drive foot-traffic *to Defendants' stores* and away from competitors (where it hopes to land a sale on terms as far away from its advertised prices as possible), Defendants also regularly send out mailers to consumers which state that its percentage off-plus-free-interest-payment terms with no down payment and no minimum payment required are "VALID IN-STORE ONLY." To that end, the following is the backside of a postcard mailed by Defendants to the residents of

San Diego County, the following specific example of which was mailed to the home of Plaintiff's own principal on December 15, 2020:



32. Plaintiff is informed and believes Defendants' use of the term "VALID IN-STORE ONLY" in the top right corner of the above-referenced postcard is intended to mislead the consumer into believing they can receive, in this case, 30% off *plus* 60 months of interest free payments with no down payment and no minimum purchase *only* if they physically travel to Defendants store and pick out merchandise to purchase on these terms while presenting the flier above. However, it is only after traveling to Defendants' store, selecting merchandise that they wish to purchase on the advertised terms (30% off plus 60 months of interest-free payments), that they are *then* told they may enjoy 30% off *or* 60 months of interest-free payments, but not both, and only on merchandise that is not excluded from participation in the sale based on "specials" only discoverable in the store.

33. On August 6, 2020, in reliance upon Defendants' false advertising and in order to ensure the competitiveness of its own advertising, representatives of

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff visited Ashley's store on Miramar Road in San Diego during regular business hours in order to determine whether Defendants actually honor their advertised terms of sale within their stores. The advertisement being run at the time – the *bait* – at the store that Plaintiffs' representatives visited was "50% off *plus* 60 months no interest," a representation that was prominently featured in Defendants' print advertising at the time, on the door of Defendants' store and in other sales literature being widely distributed by Defendants at the time both in and around the store. Upon arriving in Defendants' store, Plaintiffs' representatives observed that despite the ongoing Covid-19 pandemic, which has largely discouraged people from traveling to stores, Defendants had a large volume of customer foot traffic within their store.

34. While in the store, Plaintiffs' representatives were informed by Defendants' salesperson that the "official rules" were that Plaintiffs' representatives could only receive 60 months of free interest if there were no other incentives already applicable to the merchandise Plaintiffs' representatives wished to purchase. Upon walking around Defendants' store, Plaintiffs' representatives observed that nearly all items within Defendants' upholstery and dining departments, and all of Defendants' "14-piece packages" were already "marked down" with modest "manager specials" that automatically disqualified all of that merchandise from the terms of Defendants' advertised sale, meaning Plaintiffs' representative could not receive 50% off *or* 60 months of free interest on any of that inventory.

35. Upon walking into Defendants' "bedroom" section, Plaintiffs' representatives noted that none of the bedroom merchandise was marked down with "manager's specials," but that virtually all of Defendants' merchandise was marked up to roughly double Plaintiff's prices for similar pieces. On that merchandise, Defendants' salesperson represented that Plaintiff's representatives could receive 40% off (their already double-marked-up prices), but *not* while also

enjoying 60 months of interest free payments. Upon being confronted with Defendants' advertisement of 40% off *plus* 60 months of free interest payments, Defendants' salesperson explained that "plus" meant the second sales term was "another" sales option available but that Plaintiff's representatives could not receive *both*.

36. Plaintiff's representatives also discovered during their visit on August 6, 2020, that Defendants' salespeople were openly seeking to determine whether Plaintiff's representatives, as well as other customers, were "cash" or "credit" customers. If the customer was a "cash" customer, the salesperson explained he could negotiate up to 30% (but not 40%) off of the regular price, and that he would require a manager's approval for the additional 10%. If the customer was a "credit" customer, the salesperson asked what monthly payment Plaintiff's representatives could afford, which would then dictate, by calculating the price in reverse, what the purchase price would be by multiplying the payments the customer could afford to pay times the number of months for which the customer would make payments, without interest but also at the higher, non-discounted price. During one of Plaintiff's representatives' visits (as there were multiple in 2020), the salesperson bragged that he had managed to sell an earlier customer merchandise earlier that day for only 10% off the regular price, despite Ashley's then-active advertised sales price of 50% off *plus* 60 months of interest free payments.

37. Plaintiff is informed and believes and based thereon alleges that Defendants internally track their customer foot traffic within each of their stores and also internally correlate their foot traffic to the ads placed by Defendants in an attempt to track what kinds of misleading statements most successfully drive the most foot traffic to Defendants' stores. Plaintiff is also informed and believes and based thereon alleges that Defendants maintain "closing ratios" that assist Defendants in understanding the percentage of its customers who enter their doors

that actually end up purchasing merchandise from Defendants, and on what terms. With that information – which is possessed only by Defendants but can be obtained through discovery in this action – Plaintiff will be able to track, identify and monetize the unfair competitive advantage realized by Defendants over Plaintiff as a direct and proximate result of their false and misleading advertising, and that the same information will be relevant to determining Plaintiff's own damages resulting from Defendants' misconduct. And, because Plaintiff offers products and merchandise similar to that used by Defendants to bait and switch customers into purchasing their deliberately over-priced merchandise through their misleading use of the term "plus," Plaintiff can calculate from the same information Plaintiff's own damages through Defendants' false and misleading practices, because the sales Defendants manage to realize through their false and misleading advertising and sales practices, as detailed above, leads to lower customer volume in Plaintiff's stores and directly leads to fewer sales than Plaintiff would enjoy absent Defendants' false and misleading advertising.

**B.    Defendants' Routine Manipulation of its "Regular" Prices.**

38.    Another example of Defendants' false and misleading advertising includes its practice of deliberately overstating the actual "regular price" of its merchandise in special print advertising for the purpose of falsely inflating the "savings" to be realized from its "sale price" for that merchandise. For instance, in Defendants' New Years Super Sale print ad, which was widely distributed throughout San Diego County and a true and correct copy of which (front and back) is attached hereto as **Exhibit "C,"** and which was advertised to be valid from December 25, 2020, through January 11, 2021, Defendants deliberately misrepresented the "regular price" of their Ballinasloe 3-piece sectional sofa as "$2,299.99," and go on to offer a "sale" price of $1,150, causing consumers to perceive a "savings" of $1,149.99.

/ / / /

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1    39.    However, Defendants' ***actual*** regular advertised price for their

2    Ballinasloe 3-piece sectional sofa was and is $1,399.99, as evidenced by the price

3    consistently advertised on its website, ***including the date of this FAC***, well after

4    the date of expiration of its "sale."  By falsely inflating the "regular price" of this

5    sofa, Defendants misleadingly overstated the value of its merchandise in its New

6    Years Super Sale ad in order to misleadingly overstate the savings to be realized

7    through its "sale" of that product.  Moreover, Defendants' website ***still*** advertises

8    for sale that same Ballinasloe 3-piece sectional sofa, at a "regular price" of

9    $1,399.99, for $1,259.99, as depicted in the following advertisement on

10   Defendants' website which advertisement was run ***after*** the expiration date of

11   Defendants' alleged "New Year Super Sale":




21   40.    Defendants' falsely inflated "regular price" in its New Year's Super

22   Sale print advertisement was not limited to its Ballinasloe 3-piece sectional sofa;

23   Defendants also falsely represented the regular retail price of their Soletren sofa at

24   $1,299.99, when the actual regular price advertised by Defendants was only

25   $799.99 and Defendants misrepresented the "regular price" of their Havalance 5

26   piece dining set at $2,199.99 when their "regular price" was actually only

27   $1,339.99.  Defendants deliberately over-state the regular retail price of their

28   merchandise in order to falsely represent "discounts" that do not, in fact, exist, and

x

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

which represent a "false discount" within the meaning of Federal Trade Commission 16 C.F.R. § 233.1(a) and 16 C.F.R. § 233.3.

41.     In another "Private Sale" print ad widely distributed within San Diego County and beyond as being applicable between January 12, 2021 and January 18, 2021, a true and correct copy of which (front and back) is attached hereto as **Exhibit "D,"** Defendants falsely represented the "regular price" of their Flynnter Queen panel bed at $1,799.99, when Defendants' actual regular advertised price for that bed was actually only $749.99; an overstatement of more than $1,000.

42.     As with their misleading use of the word "plus" (described above), with full recognition that their buried "disclaimers" do not adequately disclaim or qualify its misleading headlines, Defendants are well aware of the unfair advantage the foregoing misleading advertising affords Defendants over ethical retailers like Plaintiff, but they deliberately employ them anyway.  Notably, in a November 24, 2020, internal communication to Defendants' various stores, Mr. Lebensburger suggested to Defendants' stores:

> ***Raise prices,* then offer a discount if willing to wait for delivery... the longer you wait the more you save, up to 40% off for 4 months.**

43.     Again, the foregoing statement reflects Ashley's internal decision to manipulate, by artificially "raising," their stated "regular" price only to then falsely suggest "savings" that consumers can expect to receive by virtue of their advertisements when in fact, the advertisements are simply false and deliberately misstate the regular retail price of Defendants' merchandise in order to artificially inflate the "savings" their customers can expect to receive.  Again, 15 U.S.C.A. § 45, 16 C.F.R. § 233.1, 16 C.F.R. § 233.2, and 16 C.F.R. § 233.3 all expressly prohibit this sort of "false sale" from being represented in the fashion that Defendants misleading advertise.
/ / / /

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

44. And, when consumers view billboard ads such as those contained in Paragraph 20 above, they are provided no "disclaimers" of any kind, or any way to know that Defendants' representations are false and misleading or only apply to select items within their inventory (and never with both sales features honored); at least, not until they enter Defendants' store and discover the truth, and only after investing the time and effort to select furniture for purchase.

**C.     Defendants' Misrepresentations Regarding the Quality of Their Merchandise.**

45. In addition to falsely overstating the *savings* consumers can expect to receive for such items as Defendants' Flynnter Queen panel bed (by misrepresenting the regular price as $1,799.99 when it is actually only $749.99), Defendants' misrepresentations about the "regular price" of its goods also misleads consumers into believing that the quality of its merchandise is higher than it really is.

46. Most consumers understand that a bed, rug or dresser that costs $1,000 more than another similar-appearing piece of furnishing is of a superior quality to the lower-priced item. By grossly inflating the "regular price" of its goods, as Defendants did in their New Year's Super Sale print ad run between December 25, 2020, and January 11, 2021, and in their "Private Sale" print ad run between January 12, 2021, and January 18, 2021, Defendants misled consumers into believing that their goods are of a higher quality than they really are, which also damages Plaintiff, who consistently advertises its goods honestly based on the *actual* quality of its merchandise and its *actual* retail price.

**D.     Defendants' Misleading "Time Limits" on its "Sales."**

47. In addition to the false and misleading statements described above, Defendants regularly and consistently misrepresent to consumers that its artificially reduced prices (whether 50%, 40% or some other percentage) *plus* interest free payments (whether for 12, 36 or 60 months) are available for a "limited time only."

---

They do so for the purpose of creating a false sense of urgency on the part of consumers, who reflexively respond to such ads believing they need to "act fast" and visit Defendants' stores before the sale ends. However, as is evidenced from Exhibits "B" and "C" hereto and the allegations above, the real terms under which Defendants are willing to sell their products seldom changes at all. And, they routinely refuse to honor the percentage off *plus* interest-free payments at all, even though ordinary consumers understand the term "plus" to mean both sales features will be honored. By *also* consistently misrepresenting that their "sale" is valid for a "limited time only," when the true sale terms do not materially change, Defendants mislead consumers into falsely perceiving a sense of urgency that does not, in fact, exist. Again, the purpose of doing so is always to drive foot traffic to Defendants' stores through false and/or misleading statements.

### E. The True Goal of Defendants' False Advertising.

48. As referenced above, each and all of Defendants' misleading advertisements – particularly when employed together, with billboards that advertise "50% off *plus* 36 months" of interest-free payments without qualification or exclusions when Defendants *always* exclude merchandise already on "sale" (whether actually on sale or dubbed a "manager's special" or a misrepresented "sale" based on a falsely designated "regular retail price") – are deliberately designed to lure consumers into physically visiting Defendants' stores. It is only there that consumers learn the truth about Defendants' pricing when told much of Defendants' inventory is excluded from the sale, or when they are presented with a bill and then are left to "negotiate" with Defendants to a price closer to the one consumers were lead to believe they could pay, or the terms they were misrepresented into believing they would enjoy. By that time, the consumer has already invested the time and energy to drive to Defendants' stores and couples who go together have already spent time (and often relationship capital) negotiating over mutually acceptable goods. By that point in the transaction,

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

ordinary consumers are less likely to demand Defendants honor their misrepresented sales terms and Plaintiff is informed and believes Defendants then negotiate a sale price in between what they advertised to entice the consumers into visiting their store and the true price charged to the consumer when their items are rung up using Defendants' true method of pricing their goods and excluding sales terms misleadingly advertised by them. Thus, the bait has been swallowed and Defendants have been afforded the benefit of fraudulently procured sales that they would not have enjoyed but for their false and misleading advertising, as detailed above.

49. As with the closing ratios and other sales data maintained by Defendants, Plaintiff is informed and believes Defendants maintain sales records that will easily identify the fact that the same goods are sold during the same sales events at markedly different prices. This evidence will further prove the knowing nature of Defendants' misconduct and the reason for their misconduct, which is to increase foot traffic to Defendants' stores where they realize increased sales and resulting profits by misleading consumers.

50. Higher volumes of "foot traffic" leads to higher sales because it is well known within the furniture industry (and virtually all retail industries) that once customers have entered a store (even where they have been misled into doing so), they are typically reluctant to leave one store and try to begin anew to find a better deal at another store. Moreover, as set forth above, Defendants generally only disclose the truth behind their misleading advertising after a customer or customers (often couples) have already traveled to Defendants' store and often after they have already reached agreement upon merchandise to purchase. By that point, the customers (already on the hook after unknowingly swallowing the bait offered by Defendants) are reluctant to leave and begin anew another search for product after couples have already found agreement on the items to be purchased. Defendants knowingly employ their misleading advertising for the sole purpose of

"getting customers in the door," where Defendants then exploit customer inertia for Defendants' own benefit, and to the detriment of Plaintiff.

51.    Through its false and misleading advertising practices, detailed above, Defendants have managed to divert sales away from Plaintiff primarily by deceiving customers into believing Ashley offers sales terms that simply cannot be passed up, since customers are misleads into perceiving they may enjoy up to 50% off Defendants' entire inventory *plus* up to sixty (60) months of interest-free payments to pay off their purchase.    As explained above, and by virtue of the nature of Defendants' false and misleading advertising practices, ordinary consumers do not discover the falsity of Defendants' advertisements until they are already in Defendants' stores, and at a time when they perceive an opportunity cost to leaving Defendants' stores and starting anew their search for the furniture and home furnishings they desire.    This ultimately deprives Plaintiff of the prospective customers that would otherwise patronize its stores, where Plaintiff manages to sell furniture and home furnishings to a large percentage of the customers who pass through its doors.

52.    Ashley's false advertising and manifestly unfair business practices serve to injure not only the customers, who are duped into entering Defendant's "Ashley" stores rather than Plaintiff's, but also Plaintiff and other honest retailers, since Plaintiff and other honest retailers are deprived patronage and resulting sales by these deceived customers.    Accordingly, Plaintiff brings this action for both injunctive relief (to prevent Ashley from continuing to fraudulently divert customers away from honest retailers like Plaintiff) and for the monetary damages suffered by Plaintiff as a result of Ashley's diversion of Plaintiff's customer base and resulting sales and profits.    Again, Plaintiff is informed and believes that Defendants maintain sales and advertising records that will make it relatively easy for Plaintiff to calculate their damages from Defendants' false and misleading advertising; particularly after visiting Defendants' store and observing that

1  Defendants offer many products comparable to Plaintiff's products, albeit at
2  artificially inflated in-store prices while falsely advertising its sales terms as
3  detailed above.

4      53.    Alternatively, Plaintiff seeks to disgorge Defendants of the profits
5  earned at the expense of Plaintiff and other honest retailers through their false and
6  unfair business practices described herein, while robbing Plaintiff of sales it would
7  otherwise enjoy.

8                          **FIRST CAUSE OF ACTION**

9      **False Advertising in Violation of the Lanham Act § 43(a), 15 U.S.C. §**
10                            **1125(a)(1)(B)**

11                        **(Against all Defendants)**

12     54.    Plaintiff realleges and incorporates hereby this reference the
13  allegations of Paragraphs 1 through 53 above, inclusive.

14     55.    As set forth above, Plaintiff is a competitor of Defendants, who
15  routinely competes with Defendants for customers in the highly competitive
16  business of selling furniture and home furnishings to members of the retail public
17  within Southern California and beyond.  Plaintiff prides itself in making honest and
18  accurate statements regarding its products and the prices for those products,
19  including in its advertisements that are intended to reach its customers and entice
20  them to visit Plaintiff's stores to purchase its products.  As a result of decades in
21  the business, Plaintiff knows that it reliably sells to a high percentage of the
22  customers who physically enter its retail stores.  As a result, it is well known
23  within the furniture and home furnishings industry that it is important to generate
24  customer "foot traffic" into one's stores, from which one – including Plaintiff –
25  can expect to realize sales to a high percentage of those who physically visit one'
26  stores.

27     56.    Defendants' advertising, marketing and representations of its sales
28  terms for its products, and regarding the quality of its products are false and

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

misleading. Defendants use, in interstate commerce, false, deceptive and/or misleading descriptions of the sales terms for its products, the "regular prices" of its products and the terms under which Defendants offer for sale their merchandise. And, by materially overstating the "regular price" of its products, Defendants also misrepresent the nature, characteristics and qualities of their products, by misrepresenting that they are of a higher quality than they are.

57. Defendants' false and misleading statements actually confuse and deceive, or have the tendency to, and are likely to confuse and deceive an appreciable number of relevant consumers and members of the parties' respective trade. Defendants false and misleading statements are material and likely to influence the purchasing decisions of actual and prospective purchasers of Defendants' products, to Plaintiff's detriment.

58. Defendants' false and misleading statements have diverted, do divert, and will continue to divert sales of home furnishings to Defendants at the expense of Plaintiff and its products, and Defendants' false and misleading statements have lessened, are lessening and will continue to lessen the goodwill enjoyed by Plaintiff's products, if not enjoined.

59. Defendants' acts detailed above constitute false advertising, unfair competition and false designations in violation of the Lanham Act, § 43(a)(a), 15 U.S.C. (a)(1).

60. Defendants' acts of false and misleading advertising are willful, intentional and egregious, as their own internal communications make clear, and make this an exceptional case within the meaning of 15 U.S.C. § 1117(a).

61. Plaintiff has no adequate remedy at law to compensate it for all the damages Defendants' wrongful acts have and will cause it; particularly given Defendants' consistent and relentless use of the same false advertising it has been using for years, even after entering into the consent judgment attached hereto as Exhibit "A."

## SECOND CAUSE OF ACTION

**Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code**

**§§ 17200, Et Seq.**

**(Against all Defendants)**

62.     Plaintiff realleges and incorporates hereby this reference the allegations of Paragraphs 1 through 61 above, inclusive.

63.     California's UCL prohibits any "unlawful, unfair or fraudulent business act or practice." (See Cal. Bus. & Prof. Code § 17200.)

64.     Defendants' conduct, as alleged above, is "fraudulent" within the meaning of the UCL because Defendants made, published, disseminated, and circulated the false, deceptive and misleading statements, representations and advertisements detailed above concerning the nature, quality, price, sales terms and characteristics of its merchandise, as well as the terms under which Defendants are willing to sell its merchandise.

65.     As a direct and proximate result of Defendants' false and misleading advertisements, and in reliance upon them, Plaintiff was induced to send its representatives to Defendants' store during regular business hours to determine whether Defendants would honor their stated terms, only to learn that they would not, injuring both Plaintiff and the consumers at large.  As such, Plaintiff has suffered the precise type of *direct* damages from relying on Defendants' false and misleading advertising practices as do ordinary consumers.

66.     Defendants' conduct is "unlawful" within the meaning of the UCL because it violates at least the following statutes:

- The Lanham Act, 15 U.S.C. § 1125(a);
- The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq.;
- The Federal Truth in Lending Law, 12 C.F.R. § 1002.1, et seq.; and,

/ / / /

/ / / /

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

- Unfair methods of competition in violation of Federal Trade Commission rules, 15 U.S.C.A. § 45; 16 C.F.R. § 233.1, 16 C.F.R. § 233.2, & 16 C.F.R. § 233.3.

67.     Defendants' conduct with respect to the false and misleading advertising of their products, as detailed above, was "unfair" within the meaning of the UCL because it was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of their conduct, if any, did not outweigh the gravity of the harm to its victims.     Indeed, Defendants' own internal communications make clear Defendants have knowingly and purposefully engaged in patently unfair and misleading advertising while knowing that the result is to mislead consumers in order to benefit Defendants financially while cheating consumers into patronizing Defendants' stores rather than Plaintiff's stores.

68.     Defendants' conduct with respect to the false and misleading advertising of their products and the pricing and sales terms thereof was also "unfair" because it violated public policy as declared by specific constitutional, statutory or regulatory provisions, including the False Advertising Law and the above-referenced sections of the Federal Trade Commission rules.

69.     Defendants' conduct with respect to the false and misleading advertising of their products and the pricing and sales terms thereof – including Defendants' false inflation of its "regular" prices only to falsely represent "savings" that did not exist – was also "unfair" because the consumer injury was substantial, was not outweighed by benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided.     Moreover, Plaintiff could not have avoided the harm to itself from Defendants' misconduct because Plaintiff had no reasonable means of notifying those prospective consumers, who would otherwise have patronized Plaintiff's stores, that Defendants' false and misleading advertising would lead to both the consumers'

1 harm and to Plaintiff's damages from the loss of sales to such consumers and
2 resulting loss of profits, fairly earned.

3    70.    As a direct and proximate result of Defendants' wrongful conduct,
4 Plaintiff has suffered injury in fact and has lost money or property, including lost
5 sales and damage to Plaintiff's goodwill with existing, former, and potential
6 customers and consumers.    In addition, Plaintiff directly sustained losses from
7 having to send its representatives to Defendants' stores during regular business
8 hours in reliance upon Defendants' false advertising in order to investigate
9 Defendants' false advertising, since Defendants' advertising placed into question
10 Plaintiff's own advertising and the competitiveness of Plaintiff's pricing, which
11 Plaintiff incurs substantial sums to insure it is maintaining competitive prices and
12 sales terms.

13    71.    Defendants' false and misleading conduct has also damaged
14 consumers, which damages Plaintiff because financial damage to consumers that
15 would otherwise patronize Plaintiff's stores diminishes Plaintiff's sales and
16 resulting profits.

17    72.    Defendants' wrongful acts have proximately caused and will continue
18 to cause Plaintiff substantial injury, including the loss of customers, dilution of
19 goodwill, confusion of existing and potential customers and diminution of the
20 value of Plaintiff's products and merchandise.    The harm these wrongful acts will
21 cause is both imminent and irreparable, and the amount of damage sustained by
22 Plaintiff will be difficult to ascertain if these acts continue.    Plaintiff thus has no
23 adequate remedy at law.

24    73.    By reason of the foregoing, Plaintiff is entitled to an injunction
25 restraining Defendants from engaging in further such unlawful conduct.

26    74.    Plaintiff is further entitled to restitution from Defendants.
27 ////
28 ////

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1 harm and to Plaintiff's damages from the loss of sales to such consumers and
2 resulting loss of profits, fairly earned.

3    70.    As a direct and proximate result of Defendants' wrongful conduct,
4 Plaintiff has suffered injury in fact and has lost money or property, including lost
5 sales and damage to Plaintiff's goodwill with existing, former, and potential
6 customers and consumers.    In addition, Plaintiff directly sustained losses from
7 having to send its representatives to Defendants' stores during regular business
8 hours in reliance upon Defendants' false advertising in order to investigate
9 Defendants' false advertising, since Defendants' advertising placed into question
10 Plaintiff's own advertising and the competitiveness of Plaintiff's pricing, which
11 Plaintiff incurs substantial sums to insure it is maintaining competitive prices and
12 sales terms.

13    71.    Defendants' false and misleading conduct has also damaged
14 consumers, which damages Plaintiff because financial damage to consumers that
15 would otherwise patronize Plaintiff's stores diminishes Plaintiff's sales and
16 resulting profits.

17    72.    Defendants' wrongful acts have proximately caused and will continue
18 to cause Plaintiff substantial injury, including the loss of customers, dilution of
19 goodwill, confusion of existing and potential customers and diminution of the
20 value of Plaintiff's products and merchandise.    The harm these wrongful acts will
21 cause is both imminent and irreparable, and the amount of damage sustained by
22 Plaintiff will be difficult to ascertain if these acts continue.    Plaintiff thus has no
23 adequate remedy at law.

24    73.    By reason of the foregoing, Plaintiff is entitled to an injunction
25 restraining Defendants from engaging in further such unlawful conduct.

26    74.    Plaintiff is further entitled to restitution from Defendants.
27 ////
28 ////

28
PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

# THIRD CAUSE OF ACTION

**Violation of the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, Et Seq.**

**(Against all Defendants)**

75.     Plaintiff incorporates by this reference the allegations of Paragraphs 1 through 74 above, as though fully set forth herein.

76.     The False Advertising Law ("FAL") codified at Business & Professions Code section 17500 prohibits any statement in connection with the sale of goods "which is untrue or misleading." (See Cal. Bus. Prof. Code § 17500.)

77.     Defendants knew or in the exercise of reasonable case should have known that, as alleged herein, their publicly-disseminated statements and omissions regarding the prices and sales terms for the sale of its goods were false and misleading.   Defendants' false advertising injured both consumers and Plaintiff, by diverting sales from those consumers away from Plaintiff to Defendants, and by causing the consumers to patronize Defendants' stores, to the consumers' ultimate detriment.

78.     By reason of Defendants' conduct, Plaintiff has suffered injury in fact and has lost money or property, including but not limited to lost sales and damage to Plaintiff's goodwill with existing, former and potential customers and consumers.

79.     Defendants have caused, and will continue to cause, immediate and irreparable injury to Plaintiff, including injury to Plaintiff's business, reputation and goodwill, for which there is no adequate remedy at law.

80.     Plaintiff is entitled to an injunction restraining Defendants, and each of them, from engaging in further acts of false and misleading advertising.

81.     Plaintiff is further entitled to restitution from Defendants.

/ / / /

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment as follows:

1. That the Court enter a judgment against Defendants, and each of them that they have:

   a. Violated 15 U.S.C. § 1125(a)(1)(B) by engaging in the false advertising set forth above, and others as subject to proof at trial;

   b. Competed unfairly with Plaintiff at common law and in violation of Sections 17200, et seq. and 17500, *et seq.* of the California Business and Professions Code; and,

   c. Otherwise injured the business reputation and business of Plaintiff by their acts and conduct as set forth in this Complaint.

2. That the Court issue preliminary and permanent injunctive relief against Defendants, and each of them, and that Defendants, their officers, directors, principals, agents, representatives, servants, employees, successors and assigns, and each of them and all others in active concert or participation with Defendants, enjoining and retraining them from continuing to engage in the unlawful acts of unfair advertising set forth herein;

3. That the Court enter an order declaring that Defendants, and each of them, hold illegal profits from their acts of false advertising set forth in this Complaint and demonstrated at trial or other hearing;

4. That the Court enter an order requiring Defendants, and each of them, to account for and pay Plaintiff all illegal profits earned from Defendants' acts of false advertising that have diverted profits from Plaintiff to Defendants;

5. That the Court deem this case an exceptional case within the meaning of 15 U.S.C. § 1117(a) and order Defendants, and each of them, to

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

pay Plaintiff's general, special and actual damages and/or statutory damages pursuant to 15 U.S.C. § 1117(a);

6. That Plaintiff have and recover punitive damages from Defendants in any amount determined to be appropriate at the time of trial to punish Defendants' misconduct and to deter others from engaging in similar misconduct;

7. That Plaintiff have and recover pre-judgment interest on all sums awarded it herein;

8. That the Court order Defendants, and each of them, to pay Plaintiff both the cost of this action and the reasonable attorney fees and costs incurred by Plaintiff in prosecuting this action; and,

9. That the Court grant to Plaintiff any other further and/or additional relief as the Court may determine to be just and appropriate given the facts proven at trial.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on its claims herein and on all issues and claims so triable in this action.

Dated: October 5, 2021       VIVOLI SACCUZZO, LLP

By: /s/ Michael W. Vivoli
MICHAEL W. VIVOLI
Attorneys for Plaintiff,
JEROME'S FURNITURE WAREHOUSE

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

# EXHIBIT "A"

JAN 2 5 2008 **FILED**
_5:00 A.M._
MICHAEL K. JEANES, Clerk
By ⟶ _D. Whitford_
D. Whitford, Deputy

1  Terry Goddard
   Attorney General
2  Firm Bar No. 14000
   Robert A. Zumoff
3  Assistant Attorney General
   State Bar No. 006517
4  1275 W. Washington Street
   Phoenix, Arizona 85007-2997
5  Telephone: (602) 542-7722
   Fax: (602) 542-4377
6  Consumer@azag.gov
   Attorneys for the State of Arizona
7

8              IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

9                 IN AND FOR THE COUNTY OF MARICOPA

10 STATE OF ARIZONA, ex rel. TERRY
   GODDARD, Attorney General,          Case No: CV2008-008811
11
                Plaintiff,
12                                      **CONSENT JUDGMENT**
          -vs-
13                                      (Assigned to Hon. Bethany G. Hicks)
   SOUTHWESTERN FURNITURE OF
14 WISCONSIN, L.L.C., D/B/A
   ASHLEYFURNITURE HOMESTORE, a
15 Wisconsin Limited Liability Company,
16
                Defendant(s).
17

18         The State of Arizona, having filed a complaint alleging violations of the Arizona

19 Consumer Fraud Act, A.R.S. § 44-1521 _et seq._; Defendant, Southwestern Furniture of

20 Wisconsin, L.L.C., D/B/A Ashley Furniture Homestore, a Wisconsin Limited Liability

21 Company ("Southwestern") having been served with a copy of the complaint; having been fully

22 advised of the right to a trial in this matter and, after receiving advice of counsel, having waived

23 the same; admit that this Court has jurisdiction over the subject matter and the parties for

24 purposes of entry of this Consent Judgment and acknowledges that this Court retains jurisdiction

25 for the purpose of enforcing this Consent Judgment.

26

A. Southwestern has agreed to a voluntary compromise of disputed claims, and the State of Arizona and Southwestern have agreed on a basis for the settlement of these matters in dispute.

B. Southwestern denies the State's claims in its complaint that Southwestern has violated the Consumer Fraud Act. This Consent Judgment does not constitute an admission by Southwestern for any purpose of any violation of any state law, rule or regulation nor does this Consent Judgment constitute evidence of any liability of Southwestern. This Consent Judgment is made without trial or adjudication of any issues of fact or law or finding of liability of any kind.

## PARTIES

1. Plaintiff is the State of Arizona, ex rel. Terry Goddard, the Attorney General of Arizona, who is authorized to bring this action under the Arizona Consumer Fraud Act, A.R.S. § 44-1521 *et seq.*

2. Defendant is Southwestern Furniture of Wisconsin, L.L.C., a Wisconsin limited liability company doing business under the name "Ashley Furniture Homestore." For purposes of this Consent Judgment Defendant shall be referred to as "Southwestern".

3. Southwestern is authorized to do business and does business in the Phoenix metropolitan area as a furniture retailer.

## ORDER

A. Definitions:

4. For purposes of this Consent Judgment, the following definitions shall apply:

    a. **"Advertise," "Advertising" and "Advertisement"** means the publication, dissemination, solicitation, and circulation of information promoting products and services via computer networks, television, radio or print, or through direct mailing, visual and audio displays, or through any other means.

-2-

b.  **"Zero interest financing"** means any representation in an advertisement that consumers can purchase merchandise through a finance plan that may result in no finance charge having been paid or assessed for period of time (e.g. "0 Interest," "No interest," or "No interest, no payments for 12 months").

c.  "As is" refers to a purchase of merchandise directly from a Southwestern retail store without any warranty, including without limitations, those in which Southwestern's invoices designate the sale to be "as is."

5.  The Effective Date of this Consent Judgment is the date it is signed by the Court.

**B. Application:**

6.  This Order applies to Southwestern Furniture, L.L.C., any entity controlled by Southwestern, any successor entity or entities, whether by acquisition, merger or otherwise, to the extent they are operating a retail furniture business in Arizona, and to their current and future principals, officers and directors, assigns and successors, managerial or supervisory employees, and to any other employees or agents having responsibilities with respect to the subject matter of this Order, but not in any individual capacity.

**C. General Requirements:**

7.  Southwestern shall comply with the Consumer Fraud Act, A.R.S. § 44-1521 *et seq.*, as it is currently written, or as it is amended in the future.

8.  If a disclaimer or disclosure is necessary in any part of an advertisement, it shall be made in a manner, with respect to the type of medium used for the advertisement, that is noticeable, readable, and understandable by ordinary consumers to whom the advertisement is directed, and any printed statement shall be in no less than 5-point type. .

9.  For all advertisements in any medium that offer "zero interest financing", each advertisement will include, wherever applicable, no less than the following statement: that a minimum purchase applies.

-3-

10. Within ten (10) days of the Effective Date of this Order Southwestern shall prepare a summary of the injunctive terms of this Order for all persons employed by or contracting with Southwestern who will be responsible for complying with the Order. Within thirty (30) days of the Effective Date of this Order, Southwestern shall provide a copy of the summary to the Attorney General.

**D. Delivery and Cancellation of Orders:**

11. At the time of purchase, Southwestern shall not provide a customer with an estimated delivery time unless it has a reasonable basis for making that estimate. Southwestern may include a written explanation that the actual delivery time may be affected by unforeseen events that are not within Southwestern's control. Such an explanation shall not be a basis for modifying the requirements of paragraphs 12 to 14, below.

12. At the time of purchase, estimated delivery times shall be put in writing, and Southwestern shall not orally modify or make statements inconsistent with the written estimate, including but not limited to representations that a customer can expect that delivery will likely be less than the estimated delivery time. If after a purchase new information about the estimated delivery time becomes known to Southwestern, and if a customer requests additional information, nothing herein restricts Southwestern from providing such information to a customer.

13. At the time of purchase, Southwestern shall disclose in writing to a customer that the customer may cancel his order and receive a refund within thirty (30) days of the request for refund if Southwestern fails to deliver the merchandise on or before thirty (30) days after the written estimated delivery date.

14. Southwestern shall not require a customer to accept delivery of any merchandise that is damaged or defective at the time of delivery. This provision does not apply to merchandise sold "as is" and designated "as is" on the sales invoice.

15. Southwestern shall disclose in writing to a customer at the time a customer

-4-

1  purchases merchandise from Southwestern that if merchandise is delivered in damaged or
2  defective condition and a customer so notifies Southwestern within three (3) business days after
3  delivery, Southwestern shall, within thirty (30) days after the timely notification, either replace
4  or repair the merchandise, or if Southwestern is unable to replace or repair the merchandise
5  within thirty (30) days Southwestern shall instead offer the customer a full refund. If
6  Southwestern elects to repair the merchandise, Southwestern shall repair the merchandise in a
7  workmanlike manner and correct all material defects existing at time of delivery. Nothing herein
8  applies to damage caused after delivery of merchandise.

9      16.    Nothing herein shall prohibit Southwestern from offering to resolve a complaint of
10 late delivery or damaged or defective merchandise with any additional options or combination
11 of options, including waiver of a delivery fee, cash discount, credit for future purchase, or
12 establishment of a new delivery, repair or replacement date, so long as Southwestern does not
13 misrepresent a customer's rights or refuse to honor a customer's valid request to cancel or obtain
14 a refund.

15      17.    With respect to the purchase of merchandise, Southwestern shall not charge a
16 restocking or other fee when a customer cancels an order or requests a refund of his purchase
17 price as permitted by paragraphs 13 and 15 of this Order.

18      18.    Southwestern shall not represent that an order for merchandise is a special order
19 unless Southwestern manufactures that item specifically to fill an individual customer's order.
20 Southwestern may inform customers that merchandise is ordered from factory to warehouse
21 based on individual customer purchases.

22 **E. Advertising:**

23      19.    If Southwestern makes any statement in print media representing the availability
24 of zero interest financing that is conditioned on a minimum purchase amount, Southwestern
25 shall clearly and conspicuously disclose the minimum purchase amount in no smaller than 5-
26 point type.

20.    Southwestern shall not use the unmodified term "leather" to refer to the covering of furniture, unless all of the covering of such furniture is leather. Southwestern may use terms modifying "leather," such as "leather match" to indicate that the covering of furniture is not 100% leather, if Southwestern discloses the meaning of the modified term in conjunction with its use.

21.    Southwestern shall not advertise a price for the sale of merchandise as an "Ashley direct" or similar price unless the merchandise is in fact purchased by Southwestern Furniture Industries, Inc. from Ashley Furniture Industries, Inc.

22.    In any advertisement, Southwestern shall not use terms such as "sale", "discount", "savings", or "savings event", unless this is in fact true. Those terms may relate to the selling price of individual items, as well as other reductions, such as offers of reduced financing terms, offers to sell a second item of merchandise at a reduction from Southwestern's regular price, and offers to sell a package of merchandise at a total price less than the sum of Southwestern's own regular price.

**F. Consumer Restitution:**

23.    Within thirty (30) days after the Effective Date of this Consent Judgment, Southwestern shall pay one thousand nine hundred seventy-five dollars ($1975.00) as restitution for restocking fees to those consumers designated as "Restocking Fee Complaint Consumers" whose names were provided to Southwestern prior to the Effective Date of this Consent Judgment.

24.    Within thirty (30) days after the Effective Date of this Consent Judgment, Southwestern shall communicate in writing with those four (4) consumers designated as "Damage Complaint Consumers" whose names were provided to Southwestern prior to the Effective Date of this Consent Judgment and offer those consumers the following options to resolve their complaints:

a.    Replacement of the furniture complained of with new furniture of the same

-6-

1 kind or similar furniture with the same or higher purchase price at no additional cost;

2         b.    Return of the furniture for a full refund (totaling $8,073.82 for all damage

3 Complaint Consumers); or

4         c.    Payment of compensation to the consumer equal to 50% of the purchase

5 price of the furniture complained of.

6     25.    Within sixty (60) days after the Effective Date of this Consent Judgment

7 Southwestern shall provide a written report to the Attorney General describing the actions taken

8 with respect to each consumer designated under paragraphs 23 and 24, including whether and

9 how the complaint was resolved.

10 **G. General Terms:**

11     26.    Without admitting any liability and solely to resolve this matter without the fees,

12 expenses, and risks of any litigation, Southwestern shall pay to the Arizona Attorney General the

13 amount of four hundred thousand dollars ($400, 000.00) for attorneys' fees and costs of

14 investigation, to be used for consumer fraud education and for investigative and enforcement

15 operations of the consumer protection division in accordance with A.R.S. § 44-1531.01(C).

16     27.    Southwestern shall not represent or imply that the Attorney General, the State of

17 Arizona, or any agency thereof has approved any of their actions in Arizona or has approved any

18 of their past, present or future business practices in Arizona, and Southwestern is enjoined from

19 directly or indirectly representing anything to the contrary.

20     28.    This Court retains jurisdiction of this matter for the purposes of entertaining an

21 application by Plaintiff, State of Arizona, for the enforcement of this judgment.

22     29.    This Consent Judgment may be modified or vacated by order of this Court. After

23 providing at least thirty (30) days written notice and after making a good faith effort to obtain

24 concurrence of the other party for the requested order to modify or vacate, which concurrence

25 shall not be unreasonably withheld, the party seeking an order to modify or vacate may petition

26 this Court therefore. The Court will modify or vacate this Consent Judgment upon a showing of

1  good cause.

2      30.    Before initiating any proceeding to enforce this Consent Judgment the Attorney

3  General shall provide at least thirty (30) days' written notice to Southwestern of its intent to

4  initiate such proceedings, and shall give Southwestern a reasonable opportunity to cure any

5  alleged violation. Whenever possible, the parties shall seek to resolve an alleged violation of this

6  Consent Judgment by discussion. In addition, in determining whether to enforce this Consent

7  Judgment or to seek an order for monetary, civil contempt, or any other relief or sanction, the

8  Attorney General shall give good faith consideration to whether Southwestern has taken

9  corrective action designed to cause the claimed violation to be cured and to prevent future

10  occurrences.

11      31.    This Consent Judgment is entered as a result of a compromise and settlement

12  agreement between the parties. Only the parties to this action may seek enforcement of this

13  Consent Judgment. Nothing herein is intended to create a private right of action by other parties.

14

15  DATED this 22nd day of January 208

16  **BETHANY G. HICKS**

17  _____

18  Judge of the Superior Court

19  **CONSENT TO JUDGMENT**

20      1.    Southwestern Furniture of Wisconsin, L.L.C., a Wisconsin limited liability

21  company, states that no promise of any kind or nature whatsoever was made to it to induce it to

22  enter into this Consent Judgment and that it has entered into the Consent Judgment voluntarily.

23      2.    Southwestern Furniture of Wisconsin, L.L.C., a Wisconsin limited liability

24  company, has fully read and understood this Consent Judgment, understands the legal

25  consequences involved in signing it, asserts that this is the entire agreement of the parties, and

26  that there are no other representations or agreements not stated in writing herein, and no force,

-8-

1  threats, or coercion of any kind have been used to obtain its signature.

2      3.    Southwestern Furniture of Wisconsin, L.L.C., a Wisconsin limited liability

3  company, acknowledges that Plaintiff's, State of Arizona's, acceptance of this Consent

4  Judgment is solely for the purpose of settling this litigation and does not preclude the Plaintiff,

5  or any other agency or officer of this State, or subdivision thereof, from instituting other civil or

6  criminal proceedings as may be appropriate now or in the future.

7      4.    Southwestern Furniture of Wisconsin, L.L.C., a Wisconsin limited liability

8  company, represents and warrants that the person signing below on its behalf is duly appointed

9  and authorized to do so.

11      DATED this ____ day of _____, 2008

12  Southwestern Furniture of Wisconsin, L.L.C.

14  By: _____

15  Its: _____

16
17  **APPROVED AS TO FORM AND CONTENT:**

18  **TERRY GODDARD**
   **Attorney General**

19  By: _____          By: _____
20      Robert A. Zumoff                      James A. Craft
21      Senior Litigation Counsel             Gammage & Burnham
        Counsel for Plaintiff                 Counsel for Defendant
22

23  ///

24  ///

25  ///

26  ///PHX-CLU-2007-0489/109430

-9-

# EXHIBIT "B"



## Ashley HOMESTORE

### AMAZING OFFERS!
### LABOR DAY SALE!

**HURRY IN! SALE ENDS MONDAY, SEPT. 7TH!**

**GET IT TODAY, NO CREDIT NEEDED!**

*DON'T WAIT, COME IN FOR THE BEST LABOR DAY SALE EVER!!!*

## EL CAJON HOMESTORE OPENS TODAY

### EL CAJON HOMESTORE OPENING SEPT 4TH!

**$5000 GIVEAWAY**

575 Fletcher Parkway, El Cajon, CA 92020 • 619.333.2900

*Join us Friday at 10:00am*
The first **500** customers will receive a scratcher and **1 LUCKY WINNER** will win...
**$5000** In Ashley Furniture

*See back page for complete details.*

## PLUS! $50 Ashley Gift Card
just for booking your appointment online.

Limit one gift card per household. See sales associate for details.


BOOK AN APPOINTMENT
AshleyFurniture.com

# 40% OFF††

## PLUS! 5 YEARS

**NO** interest*
**NO** down payment
**NO** minimum purchase

On purchases with your Ashley Advantage™ credit card from 8/25/20 to 9/7/20. Equal monthly payments required for 60 months. Ashley Furniture does not require a down payment, however, sales tax is due at time of purchase. †See below for details.

### NOW HIRING!
Sales Associates

### Get it Today!
### No Credit Needed!





**SAN DIEGO**

**SAN MARCOS**

# EXHIBIT "C"



# NEW YEARS

**HURRY IN! SALE ENDS MONDAY, JAN. 11TH!**
**GET IT TODAY, NO CREDIT NEEDED!**


**BOOK AN APPOINTMENT**
AT A STORE NEAREST YOU


AshleyFurniture.com

## SUPER SALE

# 50% OFF ‡‡

## PLUS

# 36 MONTHS

**• NO INTEREST* • NO DOWN PAYMENT • NO MINIMUM PURCHASE**

On qualifying purchases with your Ashley Advantage™ credit card from 12/25/2020 to 1/11/2021. Equal monthly payments required for 36 months. Ashley Furniture does not require a down payment, however, sales tax and delivery charges are due at time of purchase. See back page for details.

## OR

# 40% OFF ‡‡

## PLUS

# 60 MONTHS

**• NO INTEREST* • NO DOWN PAYMENT • NO MINIMUM PURCHASE**

On qualifying purchases with your Ashley Advantage™ credit card from 12/25/20 to 1/11/2021. Equal monthly payments required for 60 months. Ashley Furniture does not require a down payment, however, sales tax and delivery charges are due at time of purchase. See back page for details.

**Offer available in select stores only! Head to your nearest Ashley HomeStore to take advantage of them.**

Use your Ashley Advantage™ credit card from 12/25/20 to 1/11/21 on purchases and get your choice of Special Financing offers.

**YOUR #1 MATTRESS STORE IN AMERICA**
**72 LOCATIONS TO SERVE YOU!**

 Sealy    STEARNS & FOSTER     TEMPUR-PEDIC    ASHLEY SLEEP



**SOLETREN**
Stationary Sofa
Reg. Price $1299.99
$650
INCLUDES 50% OFF!
or $19 PER MONTH
for 36 MONTHS††



**BALLINASLOE**
3 Piece Sectional
Includes LAF corner chaise, armless loveseat and RAF sofa.
Reg. Price $2299.99
$1150
INCLUDES 50% OFF!
or $32 PER MONTH!
for 36 MONTHS††

**BARDARSON**
4 Piece Sectional
Includes LAF corner chaise, armless loveseat, wedge and RAF loveseat
Reg. Price $4499.99
$2250
INCLUDES 50% OFF!
or $63 PER MONTH!
for 36 MONTHS††



**BARAGA**
Home Office Desk
Reg. Price $599.99
$300
INCLUDES 50% OFF!
or $9 PER MONTH!
for 36 MONTHS††

**JOHNELLE**
5 Piece Dining Set
Includes round table and 4 chairs.
Reg. Price $1899.99
$950
INCLUDES 50% OFF!
or $27 PER MONTH!
for 36 MONTHS††

**STARMORE**
Home Office Desk
Reg. Price $1199.99
$600
INCLUDES 50% OFF!
or $17 PER MONTH!
for 36 MONTHS††



**HAVALANCE**
5 Piece Dining Set
Includes round counter height table and 4 bar stools.
Reg. Price $2199.99
$1100
INCLUDES 50% OFF!
or $31 PER MONTH!
for 36 MONTHS††

**WYSTFIELD**
Large TV Stand
Reg. Price $949.99
$475
INCLUDES 50% OFF!
or $14 PER MONTH! for 36 MONTHS††

---

Offer available in select stores only! Head to your nearest **Ashley HomeStore** to take advantage of them.

Use your **Ashley Advantage™** credit card from 12/25/20 on purchases and get your choice of Special Financing offers.

**YOUR #1 MATTRESS STORE IN AMERICA**
72 LOCATIONS TO SERVE YOU!

Sealy    STEARNS & FOSTER    TEMPUR-PEDIC    ASHLEY SLEEP



**NOW HIRING!**
Sales Associates
Get it Today!
No Credit Needed!

Follow us at @AshleyHomeStoreWest    OPEN 7 DAYS A WEEK    *Se Habla Español*    www.AshleyFurniture.com

*Offer applies only to single-receipt qualifying purchases. Ashley HomeStore does not require a down payment, however, sales tax and delivery charges are due at time of purchase if the purchase is made with your Ashley Advantage™ Credit Card. No interest will be charged on the promo purchase if you pay it off in full, within the promo period. If you do not, interest will be charged on the promo purchase from the purchase date. The required minimum monthly payments may or may not pay off the promo purchase by the end of the promo period. Regular account terms apply to non-promo purchases and, after promo period ends, to the remaining promo balance. For new accounts: Purchase APR is 29.99%, Minimum Interest Charge is $2. Existing cardholders should see their credit card agreement for their applicable terms. Promotional purchases of merchandise will be charged to account when merchandise is delivered. Subject to credit approval. Monthly payment shown is equal to the purchase price, excluding taxes and delivery, divided by the number of months in the promo period, rounded to the next highest whole dollar, and only applies to the selected financing option shown. If you make your payments by the due date each month, the monthly payment shown should allow you to pay off this purchase within the promo period if this balance is the only balance on your account during the promo period. If you have other balances on your account, this monthly payment will be added to the minimum payment applicable to those balances. **Subject to credit approval. Minimum monthly payments required. See store for details.

‡Previous purchases excluded. Cannot be combined with any other promotion or discount. Discount offers exclude Tempur-Pedic®, Stearns & Foster® and Sealy Posturepedic Hybrid™ mattress sets, Hot Buys, floor models, clearance items, sales tax, furniture protection plans, warranty, delivery fee, Manager's Special pricing, Advertised Special pricing, and 14 Piece Packages and cannot be combined with financing specials. Effective 1/1/2018, all mattress and box springs are subject to a $10.50 per unit CA recycling fee. †Subject to availability. SEE STORE FOR DETAILS. Stoneledge Furniture LLC., many times has multiple offers, promotions, discounts and financing specials occurring at the same time; these are allowed to only be used either/or and not both or combined with each other. Although every precaution is taken, errors in price and/or specification may occur in print. We reserve the right to correct any such errors. Picture may not represent item exactly as shown, advertised items may not be on display at all locations. Some restrictions may apply. Available only at participating locations. Ashley HomeStores are independently owned and operated. ©2021 Ashley HomeStores, Ltd. Promotional Start Date: December 25, 2020. Expires: January 11, 2021.

# EXHIBIT "D"



# Ashley HOMESTORE
# PRIVATE SALE!

**HURRY IN!**
**SALE ENDS MONDAY, JAN 18TH!**

**GET IT TODAY, NO CREDIT NEEDED!**

# 48% OFF ††
# +48 months

- NO INTEREST*
- NO DOWN PAYMENT
- NO MINIMUM PURCHASE

**BOOK AN APPOINTMENT**
AT A STORE NEAREST YOU
AshleyFurniture.com

On qualifying purchases with your Ashley Advantage™ credit card from 1/12/2021 to 1/18/2021. Equal monthly payments required for 48 months. Ashley Furniture does not require a down payment, however, sales tax and delivery charges are due at time of purchase. *See back page for details.



**OLSBERG Sofa**
Reg. Price $1399.99
**$728**
INCLUDES 48% OFF††
or **$16** PER MONTH‡
for **48** MONTHS‡‡

**48% OFF!**



**REIDSHIRE 3 Piece Sectional**
Includes left-corner chaise, armless loveseat, and right-arm sofa.
Reg. Price $3199.99
**$1664**
INCLUDES 48% OFF††
or **$35** PER MONTH‡
for **48** MONTHS‡‡

**48% OFF!**

Offer available in select stores only! Head to your nearest Ashley HomeStore to take advantage of them.

Use your Ashley Advantage™ credit card from 1/12/21 to 1/18/21 on purchases and get your choice of Special Financing offers.

**YOUR #1 MATTRESS STORE IN AMERICA**
**72 LOCATIONS TO SERVE YOU!**

Sealy  STEARNS & FOSTER  TEMPUR-PEDIC  ASHLEY-SLEEP





**CENTIAR**
5 Piece Dining Set
Includes round counter height table and 4 barstools.

Reg. Price $1299.99
$676
INCLUDES 48% OFF‡‡

or $15 PER MONTH‡‡
for 48 MONTHS‡‡

**48% OFF!**

**HILLCOT**
5 Piece Dining Set
Includes rectangular table and 4 chairs.

Reg. Price $2399.99
$1248
INCLUDES 48% OFF‡‡

or $26 PER MONTH‡‡
for 48 MONTHS‡‡

**48% OFF!**



**FLYNNTER**
Queen Panel Bed

Reg. Price $1799.99
$936
INCLUDES 48% OFF‡‡

or $20 PER MONTH‡‡
for 48 MONTHS‡‡

**48% OFF!**



**RALENE Queen Storage Bed**

Reg. Price $1799.99
$936
INCLUDES 48% OFF‡‡

or $20 PER MONTH‡‡
for 48 MONTHS‡‡

**48% OFF!**



Offer available in select stores only! Head to your nearest Ashley HomeStore to take advantage of them.

Use your Ashley Advantage℠ credit card from 1/12/21 to 1/18/21 on purchases and get your choice of Special Financing offers.

**YOUR #1 MATTRESS STORE IN AMERICA**
**72 LOCATIONS TO SERVE YOU!**

Sealy · STEARNS & FOSTER · TEMPUR-PEDIC · ASHLEY SLEEP

**NOW HIRING!**
Sales Associates

**Get it Today!**
No Credit Needed!

Follow us at @AshleyHomeStoreWest   OPEN 7 DAYS A WEEK   *Se habla Español*   www.AshleyFurniture.com

**Offer applies only to a single receipt qualifying purchase. Ashley HomeStore does not require a down payment, however, sales tax and delivery charges are due at time of purchase if the purchase is made with your Ashley Advantage℠ Credit Card. No interest will be charged on the promo purchase if you pay it off, in full, within the promo period. If you do not, interest will be charged on the promo purchase from the purchase date. The required minimum monthly payments may or may not pay off the promo purchase by the end of the promo period. Regular account terms apply to non-promo purchases and, after promo period ends, to the remaining promo balance. For new accounts: Purchase APR is 29.99%; Minimum Interest Charge is $2. Existing cardholders should see their credit card agreement for their applicable terms. Prompt and purchase of merchandise will be charged to account. Not subject to credit approval. Monthly payment shown is equal to the purchase price, excluding taxes and delivery, divided by the number of months in the promo period, rounded to the next highest whole dollar amount. If you make your payments by the due date listed on your statement, the monthly payment shown should allow you to pay off this purchase within the promo period if this purchase is the only balance on your account during this promo period. If you have other balances on your account, this monthly payment may be added to the minimum payment applicable to those balances.

‡Subject to credit approval. Minimum monthly payments required. See store for details.

‡‡Previous purchases excluded. Cannot be combined with any other promotion or discount. Discount of 48% is calculated "off our Reg. Price". Some In Stock & Feature & Sealy, Stearns & Foster® & Sealy Posturepedic & Hybrid™ mattress sets, Hot Buys, floor models, clearance items, same as low, low as, furniture protection plans, warranty, delivery fee, Manager's Special pricing, Advantage Space pricing, and In Piece Packages cannot be combined with financing specials. Effective 1/12/2016, all mattresses and box springs are subject to a $10.50 per unit CA recycling fee. Subject to availability. SEE STORE FOR DETAILS. Store logos, furniture, lamps, many items included, colors, framed art and specifically may vary by unit. We reserve the right to correct any typo errors. Pictures may not represent item exactly as shown, advertised items may not be on display at all locations. Some restrictions may apply. Available only at participating locations. Ashley HomeStores are independently owned and operated. ©2021 Ashley HomeStores, Ltd. Promo Start Date: January 12, 2021. Expires January 18, 2021.**